**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., Appellants**

v.

**Daniel R. GLICKMAN, Secretary of the U.S. Department of Agriculture, et al., Appellees**

No. 99–5320.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 2000.

Decided June 30, 2000.

Anne M. Wagner argued the cause for appellants. With her on the briefs was Mark Roth.

Alfred Mollin, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were David W. Ogden, Acting Assistant Attorney General, William B. Schultz, Deputy Assistant Attorney General, Barbara C. Biddle, Attorney, and Wilma A. Lewis, U.S. Attorney.

Before: EDWARDS, Chief Judge, RANDOLPH and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 604, and the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 455, require inspectors appointed by the Department of Agriculture ("USDA") to perform a "post-mortem inspection" of the carcasses and parts of all livestock and birds processed for human consumption. The question in this appeal from the judgment of the district court is whether the statutes permit federal inspectors to step back from the processing lines and perform their inspection duties by overseeing inspections conducted by plant employees.

I

Inspectors from the USDA's Food Safety and Inspection Service ("FSIS") generally conduct post-mortem inspections while stationed at fixed points along the slaughter processing line. Using organoleptic methods, that is, relying on sight, touch and smell, the inspectors examine the head, viscera, and exterior of each carcass for signs of adulteration, such as tumors, inflammation, parasites, and other diseases. *See* 9 C.F.R. pts. 310–11, §§ 381.76–94. If the inspector detects no signs of adulteration, the carcass is passed and marked with the USDA legend. *See* 9 C.F.R. §§ 310.8, 381.79. Under the FMIA, if the inspector finds any lesion or other condition "that might render the

meat or any part unfit for food purposes, or otherwise adulterated," the carcass (and its parts) must be retained for veterinary disposition. 9 C.F.R. § 310.3. A carcass or part found to "be unsound, unhealthful, unwholesome, or otherwise adulterated" is condemned and marked as such. *Id.* § 310.5. Similar procedures apply to inspections under the PPIA. *See id.* §§ 381.81–89.

The method of inspection just described had remained unchanged for decades. Then, in the mid–1990s, FSIS embarked on a comprehensive food safety initiative targeting the agency's resources at what it perceived as a serious health risk—foodborne pathogens, such as *salmonella* and *E. coli,* which cannot be detected by organoleptic inspection. At the same time it determined to make changes in the current inspection process to combat these microbial causes of foodborne illness, FSIS addressed what it considered to be another failure of the present regulatory system—that it provides processing plants with little incentive to detect and eliminate unacceptable carcasses before presenting them for inspection. For these reasons, FSIS decided to require "industry to assume responsibility for producing safe products, reducing foodborne pathogens, and ... to shift Agency inspection resources to those areas which present the greatest public health risk." John W. McCutcheon Decl. at ¶ 10.

In July 1996, FSIS took the first step in implementing its new initiative by promulgating the Pathogen Reduction/Hazard Analysis and Critical Control Points ("HACCP") final rule. *See* 61 Fed.Reg. 38,806 (1996). The rule "requires plants to implement science-based process control systems as a means of preventing food safety hazards, sets certain food safety performance standards, and establishes testing programs to ensure those stan-

dards are met." Food Safety and Inspection Service, HACCP–Based Inspection Models 1 (1998). It provides the industry with complete control over production decisions and execution, subject only to the performance standards set by FSIS. FSIS believes that heightening the industry's responsibility for safe meat and poultry products will increase "the incentives and flexibility establishments need to innovate and improve food safety." HACCP Final Rule, 61 Fed.Reg. 38,808.

Such advances, according to FSIS, cannot be achieved without substantial changes to its approach to inspection. As the agency put it, the roles of establishments and federal inspectors need to be "realigned to accord with the HACCP philosophy." *Id.* To design and test new inspection models, FSIS initiated the Inspection Models Development Project (the "Models Project"). Under the regulatory framework proposed in the Models Project, the task of separating normal from abnormal carcasses and parts will be carried out solely by industry personnel. Federal inspectors will be responsible for monitoring the plant's performance in sorting and for verifying its compliance with performance standards and regulatory requirements. Under the new model, a finding that a product is not adulterated will be based on FSIS's determination that the establishment's food safety and sanitation control systems are preventing adulteration.[1]

Under the new inspection models, FSIS has said that "slaughter process control will be an industry responsibility subject to FSIS oversight and verification." HACCP–Based Meat and Poultry Inspection Concepts: In–Plant Slaughter Inspection Models Study Plan, 63 Fed.Reg. 40,381, 40,381 (1998). It explained, "[e]stablishment employees will conduct ana-

---

1. The Models Project encompasses several phases. The first phase involves collecting baseline data of current performance under federal inspection in order to ensure that the new system achieves similar standards. This is followed by a period of testing the new inspection models at certain volunteer plants. Testing began in three such plants in September 1999, and FSIS has set tentative start-up dates for eighteen others.

tomical and pathological examinations of carcasses, and FSIS inspectors will oversee, evaluate, and verify the effectiveness and reliability of the establishments' slaughter process controls." *Id.* FSIS plans the transition to industry-based inspection to occur in stages. At the outset, establishment employees will only be responsible for identifying and removing trimmable defects. They will later assume responsibility for generalized condemnable conditions. And at the final stage, employees will perform "all tasks related to slaughter control," with the inspectors' role limited to oversight and verification. Food Safety and Inspection Service, HACCP–Based Inspection Models Project In–Plant Slaughter 10 (1998).

Draft guidance put out by FSIS gives some indication of what oversight and verification entails. Though the descriptions vary slightly depending on the class of animals, oversight amounts to inspectors observing establishment personnel as they process carcasses and remove unacceptable products from the food supply. By verification, FSIS means that inspectors will randomly sample and examine carcasses that have been passed to determine if the establishment is complying with the relevant performance standards.

The appellants are a group of federal meat and poultry inspectors, their union, and the Community Nutrition Institute. They brought this suit to enjoin the Secretary from "authorizing anything other than the carcass-by-carcass postmortem inspection by a federal government inspector." Brief for Appellants at 5. Following cross-motions for summary judgment, the district court ruled in the government's favor on the basis that the word "inspection" did not clearly require an organoleptic inspection. *See American Fed'n of Gov't Employees, AFL–CIO v. Glickman,* No. 98–0893, Memorandum and Order (D.D.C. Sept. 23, 1999).

## II

■ The statutory language with which we are concerned, the language supposedly allowing FSIS's oversight and verification regime, is as follows. For meat, § 604 of the FMIA provides: "the Secretary *shall cause to be made by inspectors appointed for that purpose a post-mortem examination and inspection of the carcasses and parts* thereof of all [livestock] to be prepared at any slaughtering, ... or similar establishment...." 21 U.S.C. § 604 (emphasis added). For poultry, § 455(b) of the PPIA states: "[t]he Secretary, whenever processing operations are being conducted, *shall cause to be made by inspectors post mortem inspection of the carcass of each bird processed....*" 21 U.S.C. § 455(b) (emphasis added).

The government does not deny that in the ninety or so years since passage of the FMIA in 1907, "inspection" has been taken to mean an organoleptic examination of the carcass, an inspection, that is, using the senses. Now the government has discovered another meaning. A "federal employee has performed an inspection of a carcass," the government tells us, "when he has watched a plant employee conduct the kind of examination, organoleptic or otherwise, that is necessary to determine whether the carcass is fit for human consumption. And in making these observations, the oversight inspector will observe all of the carcasses that pass along the slaughter line." Brief for the Appellees at 29.

■ In other words, the government believes that federal employees fulfill their statutory duty to inspect by watching others perform the task. One might as well say that umpires are pitchers because they carefully watch others throw baseballs. The government thinks it can arrive at its position on the basis that the word "inspection" is undefined in the statutes. But the lack of a statutory definition does not render a term ambiguous. *See Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,* 111 F.3d 1322, 1325 (7th Cir.1997). It simply leads us to give the term its ordinary, common meaning. *See Perrin v.*

*United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *Johnson v. SEC,* 87 F.3d 484, 487 (D.C.Cir.1996). And when we treat the word "inspection" in that manner, it is easy to see why there is nothing to the government's point that "an oversight inspector will necessarily observe all carcasses and parts that pass along the slaughter line." *See* John W. McCutcheon Decl. at ¶ 21. Every inspection entails an observation, but not every observation amounts to an inspection. One may observe something without paying close attention to it, and without giving it a critical appraisal, although that is what these statutes demand. The military commander may observe his troops without inspecting them. The foreman of an assembly line may do the same with widgets.

Both statutes clearly contemplate that when inspections are done, it will be federal inspectors—rather than private employees—who will make the critical determination whether a product is adulterated or unadulterated.[2] To the extent federal employees are doing any systematic inspecting under the Models Project, they are inspecting people not carcasses. Delegating the task of inspecting carcasses to plant employees violates the clear mandates of the FMIA and PPIA. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). For that reason, we reverse the grant of summary judgment and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*

---

**2.** "The term 'inspector' means: (1) an employee or official of the United States Government ..., or (2) any employee or official of the government of any State...." 21 U.S.C. § 453(k).