448 F.3d 547
 Augustine BETANCOURT, individually and on behalf of all persons similarly situated, Plaintiff-Appellant,
Lambert Watson, Plaintiff,
v.
Michael R. BLOOMBERG, in his official capacity as Mayor of the City of New York, Raymond W. Kelly, in his official capacity as Police Commissioner
of the City of New York*, and the City of New York, Defendants-Appellees.
Docket No. 04-0926-CV.
 United States Court of Appeals, Second Circuit.
 Argued: April 21, 2005.
 Decided: May 18, 2006.
 
 Eric Twiste, New York, New York (Daniel J. 2Leffell, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, Douglas H. Lasdon, The Urban Justice Center, New York, New York, on the brief), for Plaintiff-Appellant.
 Alan Beckoff, Assistant Corporation Counsel, New York, New York (Michael A. Cardozo, Corporation Counsel of the City of New York, Stephen J. McGrath, of counsel, New York, New York, on the brief), for Defendants-Appellees.
 Before: KEARSE, WINTER, and CALABRESI, Circuit Judges.
 Judge CALABRESI dissents, in a separate opinion.
 KEARSE, Circuit Judge.
 
 
 1
 Plaintiff Augustine Betancourt appeals from so much of a judgment of the United States District Court for the Southern District of New York as dismissed his claims against defendants City of New York ("City"), its mayor, and its police commissioner, brought under 42 U.S.C. § 1983, challenging Betancourt's arrest on a charge of violating City Administrative Code § 16-122. Betancourt alleged that subsection (b) of that section, which, inter alia, prohibits leaving boxes and erecting obstructions in public spaces, is unconstitutionally overbroad and, as applied to him, unconstitutionally vague; he also alleged that his arrest was without probable cause and violated his right to travel. The district court, John S. Martin, Jr., then-Judge, granted defendants' motion for partial summary judgment dismissing those claims on the grounds that § 16-122(b) was sufficiently clear to give notice both to Betancourt and to law enforcement officials as to what conduct was prohibited; that the section plainly applied to Betancourt's observed conduct; and that the section did not implicate Betancourt's right to travel. On appeal, Betancourt principally pursues his contentions that § 16-122(b) is unconstitutionally vague and overbroad and that he was arrested without probable cause. For the reasons that follow, we affirm.
 
 I. BACKGROUND
 
 2
 This case arises out of the 1997 arrest of Betancourt and other homeless persons pursuant to a City program designed to improve the quality of life in the City's public spaces. Viewed in the light most favorable to Betancourt, as the party against whom summary judgment was granted on the claims at issue on this appeal, the following facts are not in dispute except as indicated.
 
 A. The Events
 
 3
 In 1994, the City undertook a "Quality of Life" initiative designed to reduce a wide range of street crimes including prostitution, panhandling, and drug sales. Betancourt asserted that the initiative was thereafter expanded to, inter alia, reduce the number of homeless persons residing in public spaces. The City's Police Department issued a guide for law enforcement officers, listing laws that prohibited conduct targeted by the initiative. Those laws included City Administrative Code § 16-122, subsection (b) of which states that
 
 
 4
 [i]t shall be unlawful for any person, such person's agent or employee to leave, or to suffer or permit to be left, any box, barrel, bale of merchandise or other movable property whether or not owned by such person, upon any marginal or public street or any public place, or to erect or cause to be erected thereon any shed, building or other obstruction.
 
 
 5
 N.Y., N.Y., Admin. Code ("NYC Admin. Code") § 16-122(b).
 
 
 6
 In the early morning hours of February 28, 1997, in or around certain parks in lower Manhattan, police officers arrested 25 individuals, including Betancourt. Betancourt had come to the park at approximately 10:30 p.m. on February 27 with some personal possessions, three folded cardboard boxes, and a loose piece of cardboard. He used the three boxes to construct a "tube" large enough to accommodate most of his body; he placed the tube on a park bench, climbed into the tube, covered the exposed part of his body with the loose piece of cardboard, and went to sleep. At approximately 1:00 a.m. on February 28, the police roused Betancourt from his sleep and arrested him. At approximately 5:00 a.m. on March 1, 1997, Betancourt was given a Desk Appearance Ticket, noting that he was charged with violating § 16-122, and was released. By that time, the District Attorney's Office had signed a "DECLINATION OF PROSECUTION," stating that "PROSECUTION OF TH[E] CASE [against Betancourt] WAS DECLINED [because the case] Lack[ed] Prosecutorial Merit." (Declination of Prosecution dated February 28, 1997.)
 
 B. The Present Action
 
 7
 The present action was commenced in September 1997 under 42 U.S.C. § 1983 by Betancourt and by another plaintiff who has not pursued his claims. Betancourt alleged principally (a) that § 16-122(b) is unconstitutionally overbroad and unconstitutionally vague as applied to him, (b) that he had been arrested without probable cause and in violation of his right to travel, and (c) that he had been subjected to an unreasonable strip search. Following a period of discovery, both sides moved for summary judgment.
 
 
 8
 As to the vagueness challenge, defendants contended that § 16-122(b) was clear on its face. Betancourt disputed that contention, pointing out that subsection (a) of § 16-122 states that "[t]he purpose of this section is to punish those persons who abandon and/or remove component parts of motor vehicles in public streets," NYC Admin. Code § 16-122(a). He argued that § 16-122 as a whole did not provide him with reasonable notice that his conduct, which was unrelated to motor vehicles, would be unlawful.
 
 
 9
 In a Memorandum Opinion and Order dated December 26, 2000, the district court granted Betancourt's motion for summary judgment as to liability on his strip-search claim—a claim that was eventually settled and is not at issue on this appeal. As to Betancourt's remaining claims, the district court granted summary judgment in favor of defendants. See Betancourt v. Giuliani, No. 97 Civ. 6748, 2000 WL 1877071, at *7 (S.D.N.Y. Dec.26, 2000) ("Betancourt I").
 
 
 10
 In addressing Betancourt's vagueness challenge, the district court stated that a statute is not unconstitutionally vague if it (1) "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and (2) "provide[s] explicit standards for those who apply [it]." Id. at *3 (internal quotation marks omitted). The court also noted that "`[b]ecause the statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness.'" Id. (quoting United States v. Nadi, 996 F.2d 548, 550 (2d Cir.1993)).
 
 
 11
 The district court found the plain language of § 16-122(b) sufficiently clear to alert Betancourt that his conduct was prohibited. The court stated that the language that "makes it unlawful to erect or cause to be erected . . . any shed, building or other obstruction," Betancourt I, 2000 WL 1877071, at *3 (internal quotation marks omitted), was reasonably understood to apply to Betancourt's conduct because he
 
 
 12
 had erected a human-sized cardboard structure, housing a human inside, in a public space. He was not simply occupying a park bench with a few personal items. Rather, he had erected an obstruction in a public space.
 
 
 13
 . . . . Because Plaintiff had sufficient notice that his conduct was prohibited by Section 16-122(b), the statute passes the first prong of the vague as applied test,
 
 
 14
 id. at *4.
 
 
 15
 The district court rejected Betancourt's argument that subsection (b) implicitly included subsection (a)'s reference to motor vehicles. The court noted that the predecessor to § 16-122(b) had referred to, inter alia, erecting obstructions and leaving boxes and "vehicle[s]" on "public street[s]," NYC Admin. Code § 755(4)-2.0 (1964). Section § 755(4)-2.0 was substantially revised in 1969 and was eventually codified as § 16-122. Subsections (a), (c), (e), and (f) of § 16-122 were drafted to deal explicitly with motor vehicles; the language of § 755(4)-2.0 became subsection (b) of § 16-122 but was amended to remove any reference to vehicles. However, the court noted,
 
 
 16
 the prohibition against leaving boxes, barrels, bales of merchandise, and erecting sheds or obstructions in public spaces remained in subsection (b). While subsection (a) explained the purpose of the new subsections regarding motor vehicles, no such explanation was needed to explain the purpose of the prohibition against leaving other things in public spaces. Moreover, the plain meaning of subsection (b), which unlike the other subsections contains no reference to vehicles, requires that it be read as prohibiting leaving boxes and erecting obstructions in public spaces.
 
 
 17
 Betancourt I, 2000 WL 1877071, at *3 (emphases added).
 
 
 18
 The district court also found that § 16-122(b) did not give law enforcement agents unfettered discretion to make arrests, but instead provided adequate guidelines to permit them to determine whether a person was engaging in conduct that violated that subsection. Distinguishing City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999), in which the Supreme Court had found unconstitutionally vague a city ordinance that simply prohibited gang members from "loitering" in public spaces, without providing guidance as to what constituted loitering, the district court stated that
 
 
 19
 the ordinance at issue in this case offers law enforcement personnel guidance in the form of a list of specific objects, including boxes, that should not be left in public spaces.
 
 
 20
 Similarly, there is less uncertainty involved in a police determination of what constitutes an obstruction of a public space than in a police determination of what constitutes loitering in a public space. The fact that the police must exercise some discretion in the application of Section 16-122(b) does not render the regulation void. . . . The text of Section 16-122(b) provides sufficient guidelines to limit police discretion in its application, and therefore it is not void in its application to Plaintiff's conduct. Plaintiff's constitutional challenge to Section 16-122(b) therefore fails.
 
 
 21
 Betancourt I, 2000 WL 1877071, at *4-*5 (emphasis added).
 
 
 22
 Following the decision in Betancourt I, Betancourt attempted an immediate appeal. However, as his strip-search claim had not yet been fully resolved, this Court dismissed the appeal sua sponte for lack of appellate jurisdiction. See Betancourt v. Giuliani, 30 Fed.Appx. 11, 12-13 (2d Cir. 2002). After the strip-search claim was settled in 2004 by the City's agreement to pay Betancourt $15,000, a final judgment was entered, and this appeal followed.
 
 II. DISCUSSION
 
 23
 On appeal, Betancourt principally pursues his claim that § 16-122(b) is unconstitutionally vague as applied to him, arguing that "[t]he district court properly recognized . . . that Section 16-122(b) required at least a `fairly stringent' standard of vagueness, because the section imposes criminal penalties and does not have any intent requirement," but that the court "should have . . . applied a stricter, `especially stringent' standard of vagueness, because Section 16-122(b) also implicates the fundamental right to travel." (Betancourt brief on appeal at 21-22.) Betancourt also argues that § 16-122(b) is overbroad and that the police did not have probable cause to arrest him. For the reasons that follow, we find no basis for reversal.
 
 A. The Vagueness Claim
 
 24
 The Due Process Clause of the Fourteenth Amendment requires that laws be crafted with sufficient clarity to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); see, e.g., Smith v. Goguen, 415 U.S. 566, 572-73, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) ("the due process doctrine of vagueness" "incorporates notions of fair notice or warning" and "requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent `arbitrary and discriminatory enforcement'"). Thus,
 
 
 25
 [a]s generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Hoffman Estates v. Flipside, Hoffman Estates, Inc., [455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)]; Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, . . . the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." Smith, 415 U.S., at 574, 94 S.Ct. 1242. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." Id., at 575, 94 S.Ct. 1242.
 
 
 26
 Kolender v. Lawson, 461 U.S. 352, 357-58, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).
 
 
 27
 Regulations need not, however, achieve "meticulous specificity," which would come at the cost of "flexibility and reasonable breadth." Grayned, 408 U.S. at 110, 92 S.Ct. 2294 (internal quotation marks omitted). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). For example, "economic regulation is subject to a less strict vagueness test" than is legislation regulating noncommercial conduct. Id. On the other hand, a greater degree of precision is required for enactments that provide for "criminal penalties because the consequences of imprecision are qualitatively" more severe. Id. at 498-99, 102 S.Ct. 1186. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." Id. at 499, 102 S.Ct. 1186. If it does pose such a threat, "a more stringent vagueness test should apply." Id.
 
 
 28
 In the present case, § 16-122(b) is a criminal statute, and thus is subject to more than a minimal level of scrutiny. But as applied in the present case it does not impinge on constitutionally protected rights. Betancourt does not contend that his construction of a cardboard enclosure in which he could sleep, with some protection from the cold, was intended to be expressive activity protected by the First Amendment. Nor does § 16-122(b) impinge on Betancourt's other constitutionally protected rights, for, despite his contention to the contrary, it does not impair his right to travel, given that it does not restrict interstate or intrastate "freedom of movement," Kolender, 461 U.S. at 358, 103 S.Ct. 1855. Thus, only a moderately stringent vagueness test was required for a determination of whether § 16-122(b) was impermissibly vague as applied to Betancourt. The district court properly recognized this standard, and we see no basis for reversal in its application of the standard to the language of § 16-122(b) that prohibits the erection of an obstruction.
 
 
 29
 We pause to note our disagreement with the district court's ruling to the extent that it determined that the first of § 16-122(b)'s prohibitions, i.e., "leav[ing], or . . . permit[ting] to be left, any box [etc.]," provided guidance to officers in their arrest of Betancourt, on the premise that that segment made clear that "boxes . . . should not be left in public spaces," Betancourt I, 2000 WL 1877071, at *4 (emphasis added). That part of § 16-122(b) was not applicable to Betancourt. He did not "leave" his box behind; he remained inside it.
 
 
 30
 Nonetheless, the second § 16-122(b) prohibition forbids a person to "erect [in any public place] . . . any shed, building or other obstruction," and those words have plain dictionary meanings that applied to the conduct of Betancourt. For example, Webster's Third New International Dictionary (1976) ("Webster's Third") gives one definition of the verb to "erect" as to "put up (as a building or machine) by the fitting together of materials or parts." Id. at 770. An ordinary person planning to fashion three boxes into a structure that was sufficiently large for a man to crawl into, and that was designed to give him shelter against the cold, would recognize that he was planning to "put up" something "by the fitting together of materials or parts." Webster's Third defines "obstruction" as "something that obstructs or impedes," and defines "obstruct" as to "block up." Id. at 1559. An ordinary person would understand that an agglomeration of boxes large enough for a man to fit into would be "something that obstructs or impedes."
 
 
 31
 Betancourt points out that sheds and buildings are structures that would normally be of some permanence. See, e.g., Webster's Third at 2090 (defining "shed" as "a slight structure (as a penthouse, lean-to, or partially open separate building) built primarily for shelter or storage"). He also points out that the first § 16-122(b) prohibition, forbidding the "leav[ing]" of "any box, barrel, bale of merchandise or other movable property," concerns movable objects. He argues that § 16-122(b)'s final prohibition concerning "other obstruction[s]" should therefore be interpreted as limited to structures of permanence. We disagree.
 
 
 32
 An object plainly may "obstruct[ ] or impede[ ]" without doing so permanently. Had the lawmakers intended "obstruction" to mean a permanent edifice, they could have simply added that adjective before "obstruction." We think it clear that § 16-122(b) was meant to forbid any obstruction, whether permanent or temporary.
 
 
 33
 In sum, as § 16-122(b) forbids a person to "erect" an "obstruction" in a public place, we conclude that the district court properly ruled that that language was sufficient to alert Betancourt, and to provide adequate guidance to law enforcement agents, that Betancourt's conduct was prohibited. Accordingly, § 16-122(b) is not unconstitutionally vague as applied to Betancourt.
 
 B. Betancourt's Other Claims
 
 34
 Betancourt's other claims do not require extended discussion. He claims that § 16-122(b) is "unconstitutionally over-reaching because it prohibits innocent, unoffending conduct that is beyond the state's police power to regulate" (Betancourt brief on appeal at 35), i.e., "sitting, lying, or sleeping" by homeless persons "in parks and other public places, where they are not impinging on the rights of others" (id. at 37). This claim is doubly flawed. First, the Supreme Court "ha[s] not recognized an `overbreadth' doctrine outside the limited context of the First Amendment." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Because Betancourt has not raised a First Amendment challenge and is "`a person to whom a statute may constitutionally be applied,'" he "`will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.'" Parker v. Levy, 417 U.S. 733, 759, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Second, § 16-122(b) by its terms prohibits leaving or constructing in public spaces inanimate objects that are, inter alia, obstructions. That section does not appear to prohibit the conduct—"sitting, lying, or sleeping"—described by Betancourt.
 
 
 35
 Finally, the district court properly dismissed Betancourt's false arrest claim because the police, having observed him in a cardboard structure large enough to house an adult human being, which he had erected in a public space, had probable cause to arrest him.
 
 CONCLUSION
 
 36
 We have considered all of Betancourt's arguments on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 *
 Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Mayor Michael R. Bloomberg and Police Commissioner Raymond W. Kelly are automatically substituted for former Mayor Rudolph Giuliani and former Police Commissioner Howard Safir as defendants in this case
 
 
 
 37
 CALABRESI, Circuit Judge, dissenting.
 
 
 38
 The twilight arrest of Augustine Betancourt, purportedly for "erect[ing] . . . an obstruction" in a public park, presents a textbook illustration of why vague criminal laws are repugnant to the Due Process Clause of the Fourteenth Amendment. It is, as a result, troubling to me that the majority goes to such lengths to find clarity and guidance in a city ordinance that provides little of either. Because I believe the law in question, as applied to Betancourt, is unconstitutionally vague, I respectfully dissent.
 
 
 39
 For a criminal law to comport with the Due Process Clause and withstand a void-for-vagueness challenge, it must both "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply them." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). As the circumstances of Betancourt's arrest demonstrate, Section 16-122(b) of the New York City Administrative Code (hereinafter "Section 16-122(b)" or "subsection (b)") fails to perform these essential functions.
 
 
 40
 The constitutional defects arise from the ambiguous text of the law at issue. On its face, Section 16-122(b) is a bizarre grab bag of loosely-related and imprecise proscriptions:
 
 
 41
 It shall be unlawful for any person, such person's agent or employee to leave, or to suffer or permit to be left, any box, barrel, bale of merchandise or other movable property whether or not owned by such person, upon any marginal or public street or any public place, or to erect or cause to be erected thereon any shed, building or other obstruction.
 
 
 42
 N.Y.C. Admin. Code § 16-122(b). The majority opinion admits that most of these restrictions are inapplicable to Betancourt. Thus, the majority explicitly disavows the district court's conclusion that Betancourt's conduct was subject to Section 16-122(b)'s prohibition against leaving boxes or other movable property in a public place. See Majority Opinion, at *553 (finding that Betancourt "did not `leave' his box behind; he remained inside it"). Moreover, the majority does not at any point suggest that Betancourt erected a shed or a building. Left only with the language barring individuals from "erect[ing] . . . [some] other obstruction," the majority nonetheless insists that the law is not vague as applied to Betancourt, whose offending conduct was seemingly to lie down on a park bench encircled in a cardboard tube made of two boxes tucked into one another.**
 
 
 43
 The first test for constitutional vagueness is whether "a penal statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). As to this, I simply cannot see how one could divine, even after carefully studying the full text of Section 16-122(b), that sleeping on a park bench covered with cardboard is any more unlawful under the ordinance than doing so covered with blankets (which is plainly not illegal under the law at hand). Moreover, the specific words that the majority emphasizes — "to erect" and "obstruction" — do not, with or without the aid of published definitions from Webster's Third New International Dictionary, provide meaningful notice to the ordinary citizen of what is enjoined. See Colautti v. Franklin, 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 ("It is settled that, as a matter of due process, a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute . . . is void for vagueness."). Could anyone reasonably believe that "to erect" refers, as the majority would have it, to all acts of "fitting together of materials or parts"? See Majority Opinion, at *553. Such a sweeping construction would encompass everything from stitching two blankets together to stuffing one winter jacket into another, or—for that matter—to lacing a silk scarf under the collar of a fur coat on an unusually cold winter day. And, if these activities do not fall within the meaning of "to erect," on what possible basis could a person know that putting one cardboard box into another would be unlawful?*** See United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954) ("The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.").
 
 
 44
 Presumably the majority believes that it is only when one erects an "obstruction" that the prohibition of Section 16-122(b) is triggered. But Betancourt's cardboard tube placed on a park bench was no more of an obstruction than his prone body alone. Indeed, had he draped stitched blankets, stuffed jackets, or a warm fur coat over his body before laying down, would Betancourt thereby have created an obstruction? Hardly! Not even the district court thought that Section 16-122(b) "penalize[d] people for merely occupying any public place with a few of their personal belongings." Betancourt v. Giuliani, No. 97CIV6748 JSM, 2000 WL 1877071, at *2 (S.D.N.Y. Dec.26, 2000) (internal quotation marks omitted). Nor does the law, according to the lower court, "authorize the arrest of individuals for hanging around in public places." Id. What the law covers in this context then is entirely unclear, and how a person of ordinary intelligence is supposed to figure out that Betancourt's actions were forbidden is beyond me.
 
 
 45
 But it is not just the wording of the provision that makes it hard to know what the law prohibits. It is also the statutory context in which the specific ordinance is found. For the meaning of Section 16-122(b) is further obfuscated by the fact that the law is buried among a series of provisions that exclusively pertain to abandoned automobiles. In fact, apart from Section 16-122(b) — i.e., subsection (b) — all the other subsections of Section 16-122 either concern the abandonment of vehicles and vehicle parts, or they prescribe the civil and criminal penalties for violating specific provisions of the code:
 
 
 46
 § 16-122. Vehicles and other movable property.
 
 
 47
 a. Legislative intent. The need for this legislation is indicated by the ever increasing number of abandoned cars in the city of New York. The purpose of this section is to punish those persons who abandon and/or remove component parts of motor vehicles in public streets. It is not the intent to prohibit or preclude any person in lawful possession of a vehicle from making lawful repairs or removing any component part for the purpose of making such lawful repairs to a motor vehicle on a public street.
 
 
 48
 * * * * * * *
 
 
 49
 c. It shall be unlawful for any person, such person's agent or employee to leave, or suffer or permit to be left, any motor vehicle, not otherwise lawfully parked, whether or not owned by such person, in any marginal or public street, or any public place. The owner or driver of a disabled vehicle shall be allowed a reasonable time, not exceeding three hours, in which to remove said vehicle.
 
 
 50
 d. Any person convicted of a violation of the provisions of subdivision b or c of this section shall be punished by a fine of not less than fifty dollars nor more than two hundred fifty dollars, imprisonment for not more than ten days, or both.
 
 
 51
 e. It shall be unlawful for any person, such person's agent or employee, to abandon, or to suffer or permit to be abandoned any motor vehicle, whether or not owned by such person, in any marginal or public street, or any public place.
 
 
 52
 f. It shall be unlawful for any person to dismantle, or to remove any component part of any motor vehicle in any marginal or public street or any public area.
 
 
 53
 g. Any person convicted of a violation of the provisions of subdivision e or f of this section shall be punished by a fine of not less than one hundred dollars, or imprisonment for not more than one year.
 
 
 54
 h. Any person violating the provisions of subdivision b or c of this section shall be liable and responsible for a civil penalty of not less than twenty-five dollars nor more than one hundred dollars.
 
 
 55
 N.Y.C. Admin. Code § 16-122 (emphasis added).
 
 
 56
 Accordingly, Betancourt argues to us (as he did before the district court) that the unequivocal statement of legislative intent in subsection (a) demonstrates that subsection (b) was manifestly not meant to apply to his conduct, which, after all, had nothing to do with cars or car parts. Betancourt also reasons that, at the very least, the ubiquitous references to abandoned motor vehicles throughout Section 16-122 cloud the purported meaning of Section 16-122(b), and make it nearly impossible for someone reasonably to think that Section 16-122(b) implicates conduct involving cardboard boxes.
 
 
 57
 With respect to these arguments, the majority opinion is silent, and the district court's only answer was to comb through the legislative history of the law, and, on the basis of that history, to conclude that subsection (b) could be read separately from the rest of Section 16-122. See Betancourt, 2000 WL 1877071, at *3 (parsing the City Council's 1969 amendments, and comparing the text of Section 16-122 to its predecessor, Section 755(4)-2.0, to decide that "the legislative history of Section 16-122 defeats" Betancourt's contention that subsection (b), when read in the context of the full law, is difficult to decipher).
 
 
 58
 To be sure, our court has previously consulted legislative history in determining whether a law is unconstitutionally vague. See, e.g., United States v. Rybicki, 354 F.3d 124, 132-34 (2d Cir.2003) (en banc). But, in assessing whether a "person of ordinary intelligence" would "know what is prohibited," we cannot automatically assume that a lay person will, as a general matter, "perform[ ] the lawyer-like task of statutory interpretation by reconciling the text of [ ] separate documents." Rybicki, 354 F.3d at 158 (Jacobs, J., dissenting). Nor should we anticipate that ordinary citizens will research, and then reconcile, differences between older and newer laws, and, on that basis, learn what is allowed and what is unlawful. See id. at 160 (Jacobs, J., dissenting) ("Ordinary people cannot be expected to undertake such an analysis [of legislative history]; rare is the lawyer who could do it; and no two lawyers could be expected to agree. . . .").
 
 
 59
 To its credit (and unlike the district court), the majority opinion does not rely on the legislative history of the city ordinance to justify its view of what a reasonable person would think Section 16-122(b) deems unlawful. As a result, however, the majority's discussion leaves entirely unaddressed a serious source of confusion for ordinary citizens who, invariably and understandably, will read subsection (b) in the context of the rest of Section 16-122, taking account of, inter alia, the overarching aim of the city ordinance and the legislative intent of the provisions as announced in the preceding subsection. See Jones v. United States, 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("Statutory language must be read in context and a phrase `gathers meaning from the words around it.'") (quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)). In order to do this, an individual need not engage in sophisticated legal analysis or historical speculation; he need only read the language of the law as written. And, where the text is so imprecise, and the context so bewildering, that "men of common intelligence must necessarily guess at its meaning," Connally v. Gen. Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926), the law must be deemed fatally vague.
 
 
 60
 The failure to give fair notice is only the first of the two reasons why Section 16-122(b) flunks the canonical test for constitutional vagueness. To satisfy due process, the legislature must also, in drafting a criminal law, "establish minimal guidelines to govern law enforcement." Smith v. Goguen, 415 U.S. 566, 574, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). The majority opinion essentially ignores this constitutional requirement in its analysis. The void-for-vagueness doctrine calls for a disjunctive analysis. Thus, vagueness may be found either for want of notice or for want of minimal guidelines. See City of Chicago v. Morales, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) ("Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." (emphasis added)). It is also well-settled that the second requirement is today the more important one. See Kolender, 461 U.S. at 357-58, 103 S.Ct. 1855 ("Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement." (internal quotation marks omitted)); Rybicki, 354 F.3d at 160 (Jacobs, J., dissenting) ("This second inquiry is the more important of the two, and is alone sufficient to decide constitutional infirmity." (internal quotation marks omitted)).
 
 
 61
 As a consequence, I believe that the majority leaves a crucial issue unanswered: what standards, if any, does Section 16-122(b) provide to guide law enforcement, prosecutors, judges, and juries in deciding what conduct violates a law that prohibits "erect[ing] . . . [an] obstruction"? To this question, the district court had given two responses. First, it stated, without authority or argument, that "there is less uncertainty involved in a police determination of what constitutes an obstruction of a public space than in a police determination of what constitutes loitering in a public space." Betancourt, 2000 WL 1877071, at *5 (referring to the Supreme Court's determination in Morales that a city ordinance prohibiting loitering in public spaces was fatally vague). I see no basis for the lower court's assertion. It seems to me that less uncertainty in how this law is enforced may only be achieved if the discretion of police officers is bounded by guidelines or standards that delineate what qualifies as a criminal obstruction. Section 16-122(b) contains neither.
 
 
 62
 The district court also said that the ordinance "offers law enforcement personnel guidance in the form of a list of specific objects, including boxes, that should not be left in public spaces." Id. at *4. But this argument was premised on the district court's view that Betancourt had been properly arrested in part for leaving boxes in the park, a position the majority explicitly rejects. Thus, to the extent that Betancourt was detained for erecting an obstruction, the references to boxes and barrels and bales of merchandise in the first half of Section 16-122(b) supply no more guidance to police officers in interpreting what constitutes an obstruction than do the numerous references to abandoned vehicles in the rest of Section 16-122. Clarity with respect to one part of a criminal ordinance does not rectify its absence in the rest of the law. And it is the remaining and unclear part of the ordinance that Betancourt was arrested for violating.
 
 
 63
 Ironically, the only guidance on how Section 16-122(b) should be applied came from the New York Police Department itself: in 1994, the NYPD issued a catalog of "enforcement options" to effectuate then-Mayor Rudolph Giuliani's "Quality of Life" initiatives. This type of "guidance" is anything but comforting. The fact that a law against leaving boxes, barrels, and "other movable property" in a public place, on the one hand, and erecting a "shed, building or other obstruction," on the other, was listed, by the police department, as an "enforcement option" to target seemingly unrelated crimes like "prostitution, drug sales, and aggressive panhandling" is evidence of that very unfettered discretion that causes vague texts to give rise to constitutional problems. Cf. Morales, 527 U.S. at 63, 119 S.Ct. 1849 (deciding that the police's "internal rules limiting . . . enforcement to certain designated areas" fails to rescue a vague ordinance against loitering). Deriving standards as to how a law should be applied not from the text of the ordinance, as drafted by the legislature, but instead from how the police department might use the law to achieve unrelated ends runs contrary to the main reason that vagueness doctrine insists on standards in the first place. See Smith, 415 U.S. at 575, 94 S.Ct. 1242 ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law.").
 
 
 64
 As written, Section 16-122(b) leaves the initial decision as to whether someone's actions constitute a crime not with our elected legislators, but with everyday police. Why doesn't the law apply to a woman who, having wrapped herself in a fur coat and silk scarf, regularly reclines on a park bench to feed the birds? Or to a passing sportsman who, while awaiting his tour bus, takes a nap after lashing together his ski boots, skis, and snowboard? Or to the midnight photographer who mounts his camera onto a tripod and waits patiently for the perfect picture? Or would it apply in these situations, but only if the city administrators or the police were averse to pigeons, snowboarding, or troublesome artists? Cf. Grover Rees III, Cathedrals Without Walls: A View from the Outside, 61 Tex. L.Rev. 347, 371-72 (1982) (discussing the effect of "anti-parakeet sentiment . . . at the Yale Club" on the enforcement of a vague statute); Am. Fed'n of Gov't Employees, AFL-CIO v. Veneman, 284 F.3d 125, 129 (D.C.Cir.2002) (musing on H.L.A. Hart's hypothetical law — "No vehicle may be taken into the park." — as applied to strollers and skateboards (citing H.L.A. Hart, The Concept of Law 25 (1961))); Tunick v. Safir, 209 F.3d 67 (2d Cir.2000) (concerning a photographer whose metier is the taking of pictures of nude bodies in public spaces). Section 16-122(b) is an impenetrable law that could be read to allow police officers to apply the ordinance almost however they want against virtually whomever they choose. And on the night of February 27, 1997, that is precisely what they did as part of the mayor's "Quality of Life" campaign against the homeless. But let me be clear. This case is not about whether the homeless should be allowed to sleep on park benches. Perhaps they should. Perhaps they should not. The issue is whether the law that was used to prevent this homeless man from sleeping on a park gave any guidance whatsoever. Because I, as a citizen, would not know what I was prohibited from doing, and because I, as an officer of the law, would have even less of an idea of what I was empowered to stop people from doing, I conclude that the ordinance is unconstitutionally vague. Accordingly, I respectfully dissent.
 
 
 
 Notes:
 
 
 **
 In a single sentence, the majority opinion also conjectures that Section 16-122(b) does not implicate the right to travel or any other constitutionally-protected rights. On this basis, the majority purports to evaluate the law at issue under the "moderately stringent" vagueness test applicable to criminal statutes, rather than subjecting it to the more stringent test required for laws that threaten fundamental liberties. With this too, I am inclined to disagree
 As it was applied in this case, the ordinance in question seems either to jeopardize the right to travel by burdening the so-called "right to remain," see, e.g., City of Chicago v. Morales, 527 U.S. 41, 53-54, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) ("[T]he freedom to loiter for innocent purposes is part of the `liberty' protected by the Due Process Clause of the Fourteenth Amendment.... Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part of our heritage." (plurality opinion) (emphasis added) (internal quotation marks and citations omitted)), or to endanger other constitutional freedoms, see, e.g., Jones v. City of Los Angeles, 444 F.3d 1118, 1120 (9th Cir.2006) (striking down as a violation of the Eight Amendment's bar against punishing status rather than conduct a city ordinance that states that "no person shall sit, lie or sleep in or upon any street, sidewalk or public way"). I need not settle this question however. For, in my view, Section 16-122(b) is undeniably void for vagueness under either the "moderately stringent" or the "even more stringent" standard.
 
 
 ***
 In describing Betancourt's act of "erecting" something, the majority opinion claims that he "fashion[ed]three boxes into a structure. . . . designed to give him shelter against the cold." Majority Opinion, at *553 (emphasis added). One of these boxes was literally just placed on its side on one end of the park bench. After sticking the two other boxes into one another and encasing his torso within the resulting tube of cardboard, Betancourt slid his shoes and feet into the box that was lying by itself. The majority's suggestion that this third box (which simply sat sideways on the bench and was physically unconnected from the cardboard tube) was also part of what Betancourt had "erected" would entail an even looser meaning of the already-vague verb.
 The majority opinion also selectively ignores part of the very definition it presents. According to the opinion, "to erect" means to "put up (as a building or machine) by the fitting together of materials or parts." Majority Opinion, at *553 (emphasis added). The references to "a building or machine" in the dictionary definition, just like the statutory references to "shed" and "building" in Section 16-122(b), were admittedly meant to be illustrative, not exhaustive. Yet, the majority makes no attempt to explain how Betancourt's cardboard tube was tantamount to, or of a similar scale as, a building, shed, or machine.