UNITED STATES of America,

v.

Tracy LAHEY, et al., Defendants.

Case No. 10–CR–765 (KMK).

United States District Court,
S.D. New York.

Aug. 8, 2013.

Timothy Donald Sini, Esq., U.S. Attorney's Office, SDNY, New York, NY, Jeffrey Ehrlich Alberts, Esq., Anna Margaret Skotko, Esq., U.S. Attorney's Office, SDNY, White Plains, NY, for the Government.

Dominick J. Porco, Esq., Scarsdale, NY, for Defendant Ezra Arthur Davis III.

Theodore Samuel Green, Esq., Green & Willstatter, White Plains, NY, for Defendant Walter Tarrats.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

On August 2, 2011, the Government charged Ezra Arthur Davis III ("Davis") and Walter Tarrats ("Tarrats") (collectively, "the Moving Defendants"), along with three others, in an eleven-count Superceding Indictment. (Indictment ("S1") (Dkt. No. 53).) In the Superceding Indictment, the Government alleges that each of the five Defendants was a member of either the Pagans' or Mongols' Outlaw Motorcy-

cle Club, and that they, among other things, engaged in a narcotics conspiracy. (*Id.*) Here, the Court considers the Moving Defendants' Motions To Dismiss Count Eleven of the Superceding Indictment, which charges them with possessing a firearm while being "employed for" specifically prohibited persons—here, convicted felons and known drug users—in violation of 18 U.S.C. § 922(h) (" § 922(h)" or "the Bodyguard Statute"). (*See* Pre–Trial Mot. ("Tarrats's Mot.") (Dkt. No. 69); Mem. of Law in Supp. of Pre–Trial Mots. of Tarrats ("Tarrats's Mem.") (Dkt. No. 72); Notice of Mot. To Dismiss ("Davis's Mot.") (Dkt. No. 73.); Davis's Mot. Ex. 4 ("*Weaver* Mem.") [1].) For the reasons stated herein, the Moving Defendants' Motions To Dismiss Count Eleven are denied.

### I. Background

This case is the culmination of an eighteen-month undercover operation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), involving two undercover agents, one of whom ("the UC") infiltrated the Pagans' Outlaw Motorcycle Club ("the Pagans"), and became a full member, and later an officer of the Pagans. (Mem. of Law of the U.S. in Opp'n to the Defs.' Pretrial Mots. ("Gov't Mem.") 5 (Dkt. No. 84).) The other undercover agent served in a support role, posing as the UC's girlfriend. (*Id.*) The Government alleges that, during the course of the investigation, the UC observed, among other things, "that members of the [Pagans] frequently gathered for meetings and/or parties, and purchased, used, and distributed narcotics, including, among others, cocaine, crack cocaine, amphetamines, prescription medications, and marijuana, during those gatherings." (*Id.* at 5–6.) Based on the UC's observations and reports, the Government secured the Superceding Indictment, which charges Defendants with participating in a narcotics conspiracy from in or about 2004 through in or about 2010, (S1 ¶¶ 1–4), distributing narcotics, (*id.* ¶¶ 5–6), and with firearms crimes pursuant to 18 U.S.C. §§ 922(g), 922(h), and 924(c), (S1 ¶¶ 7–14).

At issue in this Opinion is Count Eleven, by which the Government charges the Moving Defendants under the Bodyguard Statute. According to the UC, Defendant Tracy Lahey hosted a Pagans gathering on May 22, 2010 at his property in Swan Lake, New York. (Gov't Mem. 6–7.) The UC claims that when he arrived, Pagans officers assigned him, along with other members, including the Moving Defendants, to perform guard duty, for discrete periods of time, at designated armed security checkpoints on Lahey's property. (*See id.* at 7.) The UC further alleges that one of the Pagans officers took the UC on a tour of the premises, pointing out where weapons were located. (*See id.*) The UC also claims that he served on guard duty with Defendant Davis, and that they were later relieved by Defendant Tarrats and another Pagans member. (*Id.*) Based on these allegations, the Government charges in Count Eleven that "[o]n or about May 22, 2010, . . . [the Moving Defendants], while being employed by [prohibited persons, and in the course of that employment,] . . . knowingly received, possessed, and transported a firearm in and affecting interstate and foreign commerce, to wit,

1. "Rather than submitting [his] own Memorandum of Law," Davis's counsel "t[ook] the liberty of annexing" the appellate briefs from *United States v. Weaver*, 659 F.3d 353 (4th Cir.2011), a case before the Fourth Circuit Court of Appeals, in which the defendants/appellees, like the Moving Defendants here, pursued statutory and constitutional challenges to the Bodyguard Statute. (Counsel's Decl. in Supp. of Mot. To Dismiss Count Eleven of the Indictment ¶ 10.) Davis's Counsel has expressly "incorporate[d] by reference all of the points and arguments of the Defendants/Appellees in that appeal." (*Id.* ¶ 11.)

DAVIS and TARRATS received and possessed a Hi–Point 9 millimeter rifle and other firearms" in violation of § 922(h). (S1 ¶ 14.)[2] The Moving Defendants seek the dismissal of this Count.

## II. Discussion

Title 18 U.S.C. § 922(g) prohibits certain classes of persons, including convicted felons and drug users, from possessing firearms. 18 U.S.C. § 922(g)(1, 3). The Bodyguard Statute, in turn, provides that:

It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment—

(1) to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or

(2) to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(h). As noted, the Government charges the Moving Defendants in Count Eleven with violating this provision by knowingly possessing a firearm—specifically, a Hi–Point rifle—while being "employed by" § 922(g) prohibited persons—specifically, members of the Pagans, who are convicted felons and/or drug users. (S1 ¶ 14.)[3]

The Moving Defendants seek the dismissal of Count Eleven pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).[4] The Moving Defendants assert, or incorporate, both statutory and constitutional challenges to the application of § 922(h) to their conduct. First, they argue that, by its terms, § 922(h) requires that a defendant be an employee of—as opposed to a mere agent or associate of—a prohibited person. If their interpretation of the statute is correct, then the Government is required to allege, and later prove at trial, that the Moving Defendants were hired by the Pagans and given wages, salary, or

**2.** The Court does not have the benefit of a fully developed evidentiary record, and must therefore base its analysis on the allegations contained in the Superceding Indictment, which allegations the Court accepts as true for the purposes of this Opinion and Order. *See, e.g., U.S. v. Huet,* 665 F.3d 588, 600–01 (3d Cir.2012) (noting that in assessing defendant's Second Amendment challenge to a charge of aiding and abetting possession of a firearm by a convicted felon, the court was "limited to determining whether, based on the allegations in the Indictment—and only the allegations in the Indictment—[defendant's] Second Amendment rights have been violated").

**3.** The Superceding Indictment states that the Moving Defendants were "employed by" prohibited persons, while the statutory language refers to persons who are "employed for" prohibited persons. In its Brief addressing these Motions, the Government agreed to resolve the "employed by"/ "employed for" discrepancy by presenting "a second superseding indictment to the grand jury in a timely

fashion, so that the charging language will more precisely mirror the statutory language." (Gov't Mem. 96 n. 11.) The Court assumes that the Government has been waiting to file a Second Superceding Indictment for the Court's resolution of the instant Motions, reasoning that if the Court were to dismiss Count Eleven on constitutional grounds, the "employed by"/"employed for" distinction would be moot. Tarrats's argument that Count Eleven should be dismissed because the Superceding Indictment does not track the statutory language is therefore denied without prejudice. If, following this Opinion, the Government does not expeditiously address its prepositional slip as promised, Tarrats may renew his Motion with respect to this argument.

**4.** The Rule provides that "a motion alleging a defect in the indictment or information [must be raised before trial]—but at any time while [a] case is pending, [a] court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense."

another form of tangible compensation in exchange for their performing guard duty at the party at Lahey's residence. Second, they argue that absent a compensation requirement, § 922(h) is unconstitutionally vague. Third, they claim that absent a compensation requirement, § 922(h) violates their First Amendment right of association. And Fourth, one Moving Defendant incorporates an argument that the application of § 922(h) to his conduct violates his Second Amendment rights.

During oral argument, the Moving Defendants further clarified their positions. The Court asked counsel for Defendant Tarrats, "[c]an I ... take it that your argument is ... that ... there is a vagueness issue that ... runs into First Amendment and Second Amendment issues as well, or ... are we not going down that road?" Counsel replied: "I didn't raise the Second Amendment issue[;] ... the constitutional issue I raised [was] vagueness." (Hr'g Tr. 78, Apr. 3, 2012.) During the same argument, counsel for Defendant Davis explained that he was not arguing that the statute requires a criminal defendant to have "be[en] paid." (*Id.* at 81.) Counsel clarified that

instead, Davis's position is that the statute requires the Government to prove *something more* than an individual's mere membership in the Pagans—or, presumably, any outlaw motorcycle club—or, in the alternative, that, if the statute requires only mere membership in an organization, it violates Davis's First Amendment association rights. Counsel for Defendant Davis also "adopt[ed]" Tarrats's vagueness challenge. (*Id.* at 88.) Based on counsel's representations, the Court concludes that both Moving Defendants are advancing a vagueness attack on Count Eleven; and Defendant Davis is expressly advancing a First Amendment overbreadth attack on Count Eleven and implicitly, by incorporation, advancing a Second Amendment challenge to Count Eleven.

### A. Statutory Challenge

The Moving Defendants argue that, as a matter of pure statutory interpretation— as opposed to as a matter of constitutional avoidance—the Bodyguard Statute requires that a firearms possessor be a compensated employee for a prohibited person.[5] (*Weaver* Mem. 5–10.) In particular,

---

**5.** Were this the only argument made by the Moving Defendants, the Court would deny their Motions as premature. The Government has represented that the language in Count Eleven of the Second Superceding Indictment will track the statutory language of the Bodyguard Statute, and if the Government makes no other changes to Count Eleven, the Second Superceding Indictment will also clearly identify the time and place of the Moving Defendants' criminal conduct. As a general matter, nothing more is required at this stage. *See United States v. Aguilar*, 585 F.3d 652, 661 n. 5 (2d Cir.2009) (noting that an indictment is sufficient "where it plainly tracks the language of the statute and states the time and place of the alleged" crime (internal quotation marks omitted)); *United States v. Frias*, 521 F.3d 229, 235 (2d Cir. 2008) ("[A]n indictment need only track the language of the statute and, if necessary to

apprise the defendant of the nature of the accusation against him, state time and place in approximate terms." (internal quotation marks omitted)). Accordingly, a stand-alone argument about what the statute requires would be better presented not as a challenge to the Superceding Indictment, but instead as an argument as to what the Government must show by way of proof—i.e., as a requested jury charge—or on a motion for judgment of acquittal, *see* Fed.R. Crim.P. 29. Here, however, because the Moving Defendants have also raised constitutional challenges to Count Eleven, the Court must determine the precise scope of § 922(h). But in so doing, the Court is merely addressing what the statute requires in the abstract, and is not expressing an opinion about the Government's ability to prove the Moving Defendants' guilt at trial. Moreover, this Opinion obviously does not preclude the Moving Defendants from filing a

the Moving Defendants contend that § 922(h) requires the Government to establish that a defendant was hired for wages, salary, or another form of tangible compensation, and that Count Eleven must be dismissed, because the Government failed to plead facts in the Superceding Indictment showing an employer-employee relationship.[6]

■ The Court begins "where all such inquiries must begin: with the language of the statute itself." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* — U.S. —, 132 S.Ct. 1670, 1680, 182 L.Ed.2d 678 (2012) (internal quotation marks omitted); *see also United States v. Wilson,* 709 F.3d 84, 86 (2d Cir.2013) ("To interpret a criminal statute, we first look to its text and identify the essential elements of the offense." (citations omitted)); *United States v. Abdur–Rahman,* 708 F.3d 98, 100 (2d Cir.2013) (per curiam) ("We begin, as we must, with the language employed by Congress and the assumption that ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)). Here, by its language, the Bodyguard Statute governs firearms possession, receipt, or transfer by individuals, who are "employed for" prohibited persons, in the course of that employment. The question, then, is what it means to be "employed for" someone. Few courts have ever addressed this question, and the phrasing "employed for" appears to be uncommon. There are, however, several definitions of "employ" which do not require a showing of tangible com-

pensation. For example, *Black's Law Dictionary* defines the transitive verb "employ" to mean "[t]o make use of," "[t]o hire," "[t]o use as an agent or substitute in transacting business," or "[t]o commission and entrust with the performance of certain acts or functions or with the management of one's affairs." *Black's Law Dictionary* (9th ed. 2009). *Merriam–Webster* similarly defines "employ" as, inter alia, "to make use of (someone or something inactive)," "to use or engage the services of," or "to provide with a job that pays wages or a salary." Merriam–Webster, "Employ," *available at* http://www.merriam-webster.com/dictionary/employ (last visited June 13, 2013). *Merriam–Webster* also defines the word "for" to mean, inter alia, "in place of" or "on behalf of." *Id.,* "For," *available at* http://www.merriam-webster.com/dictionary/for (last visited June 13, 2013). These dictionary definitions strongly suggest that the phrase "individual ... employed for" encompasses individuals who are used for or engaged in activities on behalf of others, and the statute thus covers more than just compensated employees.

To the Court's knowledge, only one appellate court, the Fourth Circuit, has considered the scope of § 922(h), and it also concluded that while the term "employ" can mean " 'to provide with a job that pays wages,' it is not limited to this narrow definition." *Weaver,* 659 F.3d at 356. The Fourth Circuit explained that if Congress had intended to include a compensation requirement, it "could have used a mone-

---

motion for a judgment of acquittal, if the Government's proof does not satisfy the requirements of the Bodyguard Statute as set forth here.

**6.** Defendant Davis requested that the Court direct the Government to make an offer of proof establishing the employer-employee relationship. (Hr'g Tr. 85, Apr. 3, 2012.) In

response, the Government stated that "[f]or the individuals that are charged with 922(h), the Government is relying on an agency principle for the ... 'course of employment' " requirement. (*Id.* at 85.) For purposes of the instant Motions, the Court will assume that the Government's theory of the Bodyguard Statute has not changed in the interim.

tary term, such as 'hire,' 'compensation,' or 'wages,' as it has done elsewhere in Title 18," but Congress chose not to include "any reference to pecuniary or monetary value." *Id.* Further, "Congress chose not to use the term 'employee of,' which typically identifies a person hired for wages," but instead "drew on the term 'employed for,' which often means 'used for' or 'engaged in the service of.'" *Id.* at 356–57.

■ But even if the statute did use "employee of," it is not clear that the Moving Defendants would prevail; the Supreme Court has consistently interpreted that phrase broadly. Indeed, when interpreting other statutes, the Supreme Court has adopted a "presumption that Congress means an agency law definition for 'employee' unless it clearly indicates otherwise." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 325, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *see also Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 739–40, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (holding that "when Congress [uses] the term 'employee' without defining it," courts should infer "that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."). Other courts have followed this presumption and defined terms such as " 'employ' and 'employee' via flexible, multi-factor tests that highlight elements of agency and control," and generally have not treated "compensation as the sine qua non of an employer-employee relationship." *Weaver,* 659 F.3d at 357 (citing cases). For example, the Ninth Circuit has explained that volunteers can be employees for the purposes of the Jones Act, 46 U.S.C. § 30104 *et seq.,* despite a lack of compensation, based on common law agency factors, such as a supervisor's ability to select, hire, and dismiss employees, and a supervisor's "control over on-the-job conduct." *See Boy*

*Scouts of Am. v. Graham,* 86 F.3d 861, 865–66 (9th Cir.1996)); *see also Weaver,* 659 F.3d at 358 (explaining that, in *Boy Scouts of America,* "the Ninth Circuit looked to agency principles in determining whether a volunteer had established the existence of an employment relationship").

■ New York law is to the same effect. As one court has explained: "The word 'employee' does not necessarily connote the payment of compensation, and an 'employment' may be engagement in services with or without expectation of compensation. Thus, anyone performing services is 'employed' and a man [or woman] who does the work of another is 'employed' in it although he [or she] receives no wages." *Gen. Accident Group v. Frintzilas,* 111 Misc.2d 306, 443 N.Y.S.2d 989, 992 (Sup. Ct.1981); *see also id.* (noting that employment can be "determined on the basis of any one of a number of factors including the element of control" (citations omitted)); *Bertino v. Equitable Fire & Marine Ins. Co.,* 214 N.Y.S.2d 155, 157 (Sup.Ct.1961) ("The master-servant relationship does not turn upon the payment of wages . . . ."); *accord In re Morton,* 284 N.Y. 167, 30 N.E.2d 369, 371 (1940) (noting that many factors determine the existence of an employer-employee relationship, most notably, control).

■ Moreover, to interpret § 922(h) as requiring a showing of compensation would be inconsistent with the structure and purpose of the statute. *See Caraco,* 132 S.Ct. at 1680 ("Statutory interpretation focuses on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (internal quotation marks omitted)); *see also Kasten v. Saint–Gobain Performance Plastics Corp.,* —— U.S. ——, 131 S.Ct. 1325, 1330–31, 179 L.Ed.2d 379 (2011) (noting that the challenged phrase, " 'filed any complaint,' . . . considered in isolation

[might] be open to competing interpretations" but explaining that when considered "in conjunction with the purpose and context" the phrase was susceptible of "only one interpretation"); *Bustamante v. Napolitano,* 582 F.3d 403, 409 (2d Cir.2009) (noting that "statutory context and purpose" supported the court's "interpretation" of the challenged provision). Congress enacted the Bodyguard Statute "to prevent the individuals listed in subsection (g) from circumventing the firearm prohibition by employing armed bodyguards." *Weaver,* 659 F.3d at 357. According to the allegations in the Superceding Indictment, prohibited persons in the Pagans attempted to achieve precisely such circumvention by posting the Moving Defendants to guard duty at the party at Lahey's residence. Thus, construing the statute in the manner suggested by the Moving Defendants would allow "gang leaders to exploit the loophole that § 922(h) aimed to close by exerting control over their underlings without paying them." *Id.*

█ In sum, the Court holds that, as evidenced by its text, context, and purpose, § 922(h) does not require the Government to allege or to prove that the Moving Defendants were hired for wages, salary, or another form of tangible compensation. Instead, the Government must prove that prohibited persons used the Moving Defendants as their substitutes or agents in possessing, receiving, or transporting a firearm. Moreover, because the statutory scope is unambiguous, the Court need not consider the Moving Defendants' arguments based on the principle of lenity. *See United States v. Wells,* 519 U.S. 482, 499, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, ... we can make no more than a guess as to what Congress intended." (al-

teration in original) (internal quotation marks omitted)).

## B. Due Process Vagueness Challenge

█ The Moving Defendants argue that if § 922(h) does not require a showing of compensation, then it is unconstitutionally vague, because it "lacks sufficient definiteness to enable ordinary persons to understand what conduct the statute prohibits." (Tarrats Reply 7 (Dkt. No. 88).) The Government characterizes this argument as "frivolous." (Gov't Mem. 95.)

█ The Court's first task is to determine the appropriate posture—as applied or facial—of the Moving Defendants' vagueness challenge to the Bodyguard Statute. In *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010), the Supreme Court reviewed a Ninth Circuit decision declaring a statute unconstitutionally vague. The Supreme Court did not agree with the lower court's claim that "it was not addressing a facial vagueness challenge," because the lower court had ruled the statute unconstitutional based, in part, on "the statute's application to facts not before [the court]" and "in hypothetical circumstances." *Id.* at 2719. According to the Supreme Court, the lower court, in so ruling, had "contravened the rule that a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* (brackets and internal quotation marks omitted). The Supreme Court acknowledged that such a plaintiff might have a valid First Amendment overbreadth attack, but noted that the doctrines must remain distinct. *See id.* The Supreme Court held that even where, as here, "a heightened vagueness standard applies," because the challenged statute criminalizes expressive or associational activity, "a plaintiff whose [conduct]

is clearly proscribed cannot raise a successful vagueness claim." *Id.*[7]

The Court therefore begins by examining whether § 922(h) is unconstitutionally vague as applied to the Moving Defendants. A two-part test governs this inquiry: "[A] court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Farrell v. Burke,* 449 F.3d 470, 486 (2d Cir.2006) (internal quotation marks omitted); *see also FCC v. Fox Television Stations, Inc.,* —— U.S. ——, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012) ("[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required. . . . A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (internal quotation marks omitted)); *Skilling v. United States,* 561 U.S. 358, 130 S.Ct. 2896, 2927–28, 177 L.Ed.2d 619 (2010) ("To satisfy due process, a penal statute must define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." (internal quotation marks and citation omitted)); *Commack Self-Serv. Kosher Meats, Inc. v. Hooker,* 680 F.3d 194, 213 (2d Cir.2012) (explaining that "[a] statute can be impermissibly vague . . . if it fails to provide

people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" (internal quotation marks omitted)); *United States v. Farhane,* 634 F.3d 127, 136 (2d Cir.2011) ("For a conviction to comport with the constitutional mandate of due process, the penal statute at issue must define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." (citation and internal quotation marks omitted)).

While "a statute [that] interferes with the right of free speech or of association," is held to a more stringent vagueness test than other criminal and regulatory statutes challenged as vague, the Supreme Court has not clearly defined this level of scrutiny, noting merely that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Brown v. Entm't Merchs. Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2743, 180 L.Ed.2d 708 (2011) (internal quotation marks omitted); *see also Commack,* 680 F.3d at 213 ("The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all."); *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 179 (2d Cir.2006) ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity, and flexible standards granting considerable

---

7. In other words, *Holder* stands for the proposition that only an individual who has a meritorious as-applied vagueness challenge to a statute may assert a facial vagueness challenge to that statute. *Holder* thus resolved what had previously been an open question in the Second Circuit. *See Thibodeau v. Portuondo,* 486 F.3d 61, 67–71 (2d Cir.2007) (holding that plaintiff's as-applied vagueness challenge failed on the merits and assuming, without deciding, that plaintiff consequently lacked standing to assert a facial challenge).

discretion to public officials can pass constitutional muster." (alteration in original) (internal quotation marks omitted)); *United States v. Kimble*, 905 F.Supp.2d 465, 472–73 (W.D.N.Y.2012) (same).

With regard to the first factor—i.e., notice—the test is "an objective one," and a court must "ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." *Dickerson v. Napolitano*, 604 F.3d 732, 745–46 (2d Cir.2010) (citations and internal quotation marks omitted); *see also Thibodeau v. Portuondo*, 486 F.3d 61, 67 (2d Cir.2007) (same); *Farrell*, 449 F.3d at 486 (same). "This test does not demand meticulous specificity in the identification of proscribed conduct. Rather, it requires only that the statutory language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Coppola*, 671 F.3d 220, 235 (2d Cir.2012) (internal quotation marks omitted); *see also Arriaga v. Mukasey*, 521 F.3d 219, 224–25 (2d Cir.2008) (same).

With respect to the second factor—i.e., the discretion available to government officials charged with enforcing the challenged rule—

[T]he Constitution does not ban *all* discretion on the part of police officers or prosecutors as [e]ffective law enforcement often requires the exercise of some degree of police judgment. Due process, after all, does not impose impossible standards, and lest [courts] convert the Constitution into an insuperable obstacle to legislation, [courts] must acknowledge that it requires only reasonable precision in criminal statutes.

*Thibodeau*, 486 F.3d at 69 (second alteration and emphasis in original) (citations and internal quotation marks omitted); *see also Dickerson*, 604 F.3d at 747 ("[A] law need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." (internal quotation marks omitted)); *Betancourt v. Bloomberg*, 448 F.3d 547, 552 (2d Cir.2006) (same). The Supreme Court has "in the past struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'— wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Holder*, 130 S.Ct. at 2720 (internal quotation marks omitted); *see also United States v. Williams*, 553 U.S. 285, 306, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) (collecting cases). Moreover, a provision may be unconstitutionally vague if it provides virtually unlimited discretion to law enforcement. *See City of Chicago v. Morales*, 527 U.S. 41, 63, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) (striking down ordinance, in part, due to the "vast amount of discretion granted to the police in its enforcement"); *Hayes v. N.Y. Att'y Grievance Comm.*, 672 F.3d 158, 169 (2d Cir.2012) ("A regulation will encounter valid vagueness objection if it accords 'unfettered discretion' to those who enforce it. . . ."). But a statute will survive an as-applied vagueness challenge "if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farhane*, 634 F.3d at 139–40 (internal quotation marks omitted); *see also Kuck v. Danaher*, 822 F.Supp.2d 109, 134 (D.Conn.2011) ("[A] statute that provides what may be unconstitutionally broad discretion if subjected

to a facial challenge may still be upheld as constitutional on an as-applied challenge if the particular enforcement at issue [is] consistent with the core concerns underlying the [statute] such that the enforcement did not represent an abuse of discretion under the statute." (second and third alteration in original) (internal quotation marks omitted)).

Here, the Bodyguard Statute satisfies the notice requirement, because the statutory elements of the crime are conveyed by terms with clear definitions and settled legal meanings. The Moving Defendants do not even attempt to argue that "receive," "possess," or "transport" lack requisite specificity. Furthermore, "the knowledge requirement" in the Bodyguard Statute, discussed at greater length below, "further reduces any potential for vagueness, as [the Supreme Court has] held with respect to other statutes containing a similar requirement." *See Holder*, 130 S.Ct. at 2720 (discussing knowledge requirement of 18 U.S.C. § 2339B); *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (finding that knowledge requirement of Colorado criminal statute ameliorated the statute's potential vagueness); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 523, 526, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) (same with respect to since-repealed 21 U.S.C. § 857); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (noting that "a scienter requirement may mitigate a law's vagueness"). The Moving Defendants' only argument is that the statute is vague insofar as it applies to arrangements and associations beyond traditional employer-

employee relationship. But, as noted, the "employed for" language of the statute is not ambiguous. Moreover, based on the allegations contained in the Superceding Indictment—which, as previously explained, the Court must accept as true for the time being—the Moving Defendants here engaged in conduct that is clearly prohibited by § 922(h), and which constitutes the arguable core of § 922(h): They allegedly acted as armed guards, at the direction of prohibited persons who were their superiors in a criminal scheme: an alleged narcotics conspiracy.[8] *See Weaver*, 659 F.3d at 357 (noting that in enacting § 922(h), Congress was expressly concerned by "members of criminal organizations"); 114 Cong. Rec. 13869 (1968) (statement of Senator Long, discussing the threat posed by convicted felons in the Mafia and other criminal organizations who "may have a number of gun-carrying lieutenants working for them who would otherwise be permitted to possess firearms");[9] *cf. United States v. Marzzarella*, 595 F.Supp.2d 596, 601 (W.D.Pa.2009) (noting that provisions of 18 U.S.C. § 922 comprise "a broad statutory scheme designed ... to keep [firearms] out of the hands of those individuals who are considered dangerous").

Moreover, because the Moving Defendants' conduct was clearly prohibited, the enforcement of the statute against them did not constitute an abuse of discretion, and the Court need not further consider the second factor of the as-applied vagueness test. *See, e.g., Farhane*, 634 F.3d at 139–40 ("[I]f the conduct at issue falls within the core of the statute's prohibition

---

**8.** Again, the Court is not evaluating whether the Government can prove these allegations at trial.

**9.** Senator Long was the sponsor and manager of the Omnibus Crime Control and Safe

Streets Act of 1968, originally codified at 18 U.S.C. § 1202. Section 1202 was repealed in 1986, Pub. L. No. 99–308, 100 Stat. 459, and its terms were incorporated into § 922(g) and § 922(h).

... [,] ... the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." (internal quotation marks omitted)); *Kuck*, 822 F.Supp.2d at 134 (same). But the Court also notes that, on remand from the Fourth Circuit's decision in *Weaver*, the District Court for the Southern District of West Virginia found that "§ 922(h) is not susceptible of arbitrary enforcement" given "[t]he requirement that defendants must *know* they are being employed for a prohibited person when they wield firearms." *United States v. Weaver*, No. 09–CR–0222, 2012 WL 727488, at *12 n. 17 (S.D.W.Va. Mar. 6, 2012) (emphasis added); *see also Holder*, 130 S.Ct. at 2720 (noting that a knowledge element of a crime protects against arbitrary enforcement). This Court agrees.

For these reasons, the Moving Defendants' vagueness challenge fails. While the scope of the statute "may not be clear in every application, ... the statutory terms are clear in their application to [the Moving Defendants'] ... conduct, which means that [Defendants'] vagueness challenge must fail." *Holder*, 130 S.Ct. at 2720; *see also Weaver*, 2012 WL 727488, at *11 ("The allegations in this case are sufficient to place Defendants squarely within § 922(h)'s prohibition on carrying firearms while 'employed for' a convicted felon, and accordingly, their as-applied vagueness challenge must fail."). And because the Court has determined that the Bodyguard Statute is not vague as applied to the Moving Defendants, they "cannot complain of the vagueness of the law as applied to the conduct of others." *Holder*, 130 S.Ct. at 2719 (internal quotation marks omitted);

*see also Skilling*, 130 S.Ct. at 2933 ("[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance ... where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions." (alterations in original) (internal quotation marks omitted)). The Moving Defendants' invocation of potential absurd applications of § 922(h)—for example, to criminalize a convicted-felon farmer's asking his son or daughter to shoot a coyote—is precisely the kind of argument that is disfavored in the posture of an as-applied vagueness challenge.

### C. First Amendment Challenge

Defendant Davis argues that if § 922(h) is interpreted as not requiring a showing of an employer-employee relationship, it violates his First Amendment freedom of association. In particular, he incorporates the assertion that "[t]he First Amendment right of association is burdened if, before joining a club, one must check the membership lists for prohibited persons who could conceivably *use* one's ability to carry firearms." (*Weaver* Brief 15–16 (emphasis in original).) Davis also incorporates the argument, made in *Weaver*, that § 922(h) "does not require that the defendant know s/he is being used, nor does it require that the use be for a wrongful purpose." (*Id.* at 16.)

Whether expressed as an as-applied or an overbreadth attack, Davis's argument is the same: The Bodyguard Statute is unconstitutional, if it imposes criminal penalties on individuals who possess (or receive, or transport) a firearm, and who merely associate with prohibited persons. And in either posture, Davis's argument is wholly without merit.[10]

---

**10.** The Court cannot tell whether Davis intends to invoke the overbreadth doctrine. The Court's confusion may be due to the fact

that Davis's argument is incorporated from an appellate brief before another court. The Court will explain why the argument is with-

The Court's first task, notwithstanding the posture of Davis's argument, is to interpret the challenged statute. *See United States v. Stevens,* 559 U.S. 460, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010) (noting that even when reviewing an overbreadth challenge, the court's "first step ... is to construe the challenged statute[, because] it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." (internal quotation marks omitted)); *Adams v. Zenas Zelotes, Esq.,* 606 F.3d 34, 38 (2d Cir.2010) (same). Because Davis's First Amendment argument is based on the assertion that the Bodyguard Statute does not require an individual to know that he or she is being employed for a prohibited person, (*Weaver* Mem. 16), the Court must interpret § 922(h)'s knowledge requirement. The Bodyguard Statute makes it unlawful, in relevant part, "for any individual, who *to that individual's knowledge and* while being employed for" a prohibited person "in the course of such employment ... to receive, possess, or transport any firearm." 18 U.S.C. § 922(h) (emphasis added). The phrase "to that individual's knowledge," appears to be uncommon in federal criminal law, and it is potentially ambiguous along two dimensions. First, the extent of the knowledge requirement is potentially unclear. What knowledge must a charged individual have had: that he or she was acting illegally or of the facts and circumstances necessary to establish the crime? Second, it is potentially unclear to which elements of the crime that knowledge requirement applies. Does the requirement govern the individual's being employed for a prohibited person; his or her receiving, etc., a firearm; his or her doing so in the course of his or her employment; or every one of these elements?

The Court starts, as it must, with the text. Unfortunately, the text does not directly address either axis of ambiguity. Moreover, § 922(g)—which defines the category of prohibited persons for the purposes of § 922(h)—is not a useful analogue, because § 922(g) does not contain an express knowledge element, and the Second Circuit has not resolved whether § 922(g) requires that the defendant be aware of his or her prior conviction; courts within the Second Circuit thus interpret § 922(g) to require only that the defendant knew that he or she possessed a gun. *See United States v. Amante,* 418 F.3d 220, 221 n. 1 (2d Cir.2005) (stating the elements of the offense); *see also United States v. Reap,* 391 Fed.Appx. 99, 104 (2d Cir.2010) ("[T]his Circuit has not yet addressed whether § 922(g) requires proof that the defendant knew that he had suffered a prior felony conviction."); *United States v. Oakes,* No. 09–CR–0044, 2009 WL 3876009, at *1 (D.Vt. Nov. 18, 2009) (noting that under § 922(g), "there is no requirement that the defendant must be aware of the statute or of the conviction"). Furthermore, 18 U.S.C. § 924, which sets forth penalties for firearms charges, states that "whoever ... knowingly violates subsection (a)(4), (f), (k), or (g) of section 922 ... shall be fined under this title, imprisoned ..., or both." 18 U.S.C. § 924(a)(1)(B). In other words, by its express terms, § 924's "knowingly violates" requirement governs violations of § 922(g) but not of § 922(h). The Court thus must interpret both the extent, and the application, of the Bodyguard Statute's knowledge requirement based on other tools.

■ With respect to extent, the Court must determine whether the phrase "to that person's knowledge" requires a defendant to know specifically "that the conduct

out merit, regardless of the posture of Davis's

attack.

in question violated the law" or merely "of facts and circumstances that amount to a violation, without specific knowledge of the law." *See United States v. Weintraub*, 273 F.3d 139, 146 (2d Cir.2001). The Second Circuit has held that the related phrase "knowingly violated," which "is commonly used in criminal provisions," *id.*, requires only the latter—i.e., "knowledge of the facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." *Id.* at 147.

■■■ The Court concludes that the same standard applies here. "Determining the extent of the mens rea required by a statute ... involves a 'commonsense evaluation of the nature of the particular device ... Congress has subjected to regulation and the expectations that individuals may legitimately have in dealing with the regulated items.'" *Id.* (quoting *Staples v. United States*, 511 U.S. 600, 619, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)). "The touchstone is the defendant's 'settled expectations' about the regulated conduct." *Id.* at 148 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 71, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994)); *cf. United States v. George*, 386 F.3d 383, 393–94 (2d Cir.2004) (noting that " 'willfully' ... does not require the government to prove the defendant's specific intent to violate the particular criminal statute in question," especially where used to describe engaging in criminal conduct in which "no one harbors settled expectations that he [or she] is free to" engage (internal quotation marks omitted)). For example, in *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Supreme Court held that a defendant could be convicted of possessing unregistered grenades without proof that he knew they were unregistered, because grenades were obviously dangerous, closely regulated weapons, and "one would hardly be surprised to learn that possession of hand grenades is not an innocent act," *id.* at 609, 91 S.Ct. 1112. In *Staples*, by contrast, the Supreme Court held that a defendant could not be convicted of possessing an unregistered machine gun without proof that he knew the gun was automatic and therefore a machine gun, questioning "whether regulations on guns are sufficiently intrusive that they impinge upon the common experience that owning a gun is usually licit and blameless conduct." 511 U.S. at 613, 114 S.Ct. 1793. Applying these cases, and the settled expectations test, the critical fact here is that § 922(h) does not criminalize the possession of a firearm by an individual who merely associates with a prohibited person. Instead, it reaches individuals who are "employed for" prohibited persons. This distinction is significant, because legal gun owners might be surprised to learn that they cannot carry guns when they *associate with* prohibited persons, but they likely would not be surprised to learn that they cannot carry guns *on behalf of* prohibited persons. *Cf. Holder*, 130 S.Ct. at 2730–31 (holding that Congress could not prohibit individuals and human rights groups from merely associating with foreign terrorist organizations but could prohibit individuals and groups from providing material support to those organizations). The Court is thus unwilling to interpret "knowledge," as used in the Bodyguard Statute, to require an individual to have specific intent to violate this law.

■■■■ The Court must next determine to which elements of the crime this knowledge requirement applies. At first blush, it might appear, based on the structure of the provision—specifically, the use of the coordinating conjunction "and"—that the phrase "to that individual's knowledge" applies only to the individual's re-

ceipt, possession, or transportation of a firearm. But "courts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element." *Flores–Figueroa v. United States,* 556 U.S. 646, 652, 129 S.Ct. 1886, 173 L.Ed.2d 853 (2009). Indeed, courts do so even where "knowingly" appears in a different subsection from the relevant language, and does not directly modify or describe the relevant criminal conduct. *See X–Citement Video,* 513 U.S. at 68–69, 115 S.Ct. 464 (rejecting "[t]he most natural grammatical reading" of the challenged statute—that " 'knowingly' modifies only the surrounding verbs"— "both because of anomalies which result from this construction and because of the restrictive presumptions that some form of scienter is to be implied in a criminal statute even if not expressed"). Moreover, interpreting the knowledge requirement to govern the "employed for" element of § 922(h) is particularly appropriate here, because, as noted above, agency principles control the definition of "employed" and "employment" in the Bodyguard Statute, and "[i]t is paradigmatic that any agency relationship—that is, a relationship whereby one individual acts on behalf of another—requires 'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " *Weaver,* 2012 WL 727488, at *7 (quoting Restatement (Second) of Agency § 1(1) (1958)). Finally, to the extent that there is any textual ambiguity, the Court notes that interpreting the knowledge requirement to govern the "employed for" element of the crime is also consistent with the Bodyguard Statute's legislative history. *See* 114 Cong. Rec. 14773 (1968) (statement by Senator Long that the law "prohibit persons employed by another from . . . possessing . . . a firearm in the course of his employment *if he knows* his employer is" a prohibited person (emphasis added)).

In sum, the Court holds that the proper interpretation of § 922(h) is that a defendant must have known each of the following: that his employer was a prohibited person—i.e., a convicted felon, a drug user, etc.; that he or she received, possessed, or transported a firearm; and that his or her receipt, possession, or transportation of the firearm was in the course of his or her employment for a prohibited person. *See Weaver,* 2012 WL 727488, at *7 ("[I]mplicit in the concept of 'employment' is an additional knowledge requirement into § 922(h): the defendant must know that he is carrying a firearm on behalf of a known prohibited person."). A defendant need not have known, however, that his or her conduct violated the law.

■ So construed, § 922(h) does not penalize Davis's freedom of association. In *Holder v. Humanitarian Law Project,* plaintiffs brought a similar as-applied freedom of association challenge to a statute that prohibits giving material support to foreign terrorist organizations. 130 S.Ct. at 2716, 2730. The Supreme Court rejected the challenge, noting that because "the statute does not penalize mere association with a foreign terrorist organization[,] . . . [court] decisions scrutinizing penalties on simple association . . . are inapposite." *Id.* at 2730; *see also id.* at 2718. The Supreme Court accordingly distinguished that statute from unconstitutional laws which " 'sweep[ ] indiscriminately across all types of association . . . without regard to the quality and degree of membership.' " *Id.* at 2730 (quoting *United States v. Robel,* 389 U.S. 258, 262, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967)) (citing *De Jonge v. Oregon,* 299 U.S. 353, 362, 57 S.Ct. 255, 81 L.Ed. 278 (1937)). The same logic applies with equal force here. The Government's

application of the Bodyguard Statute to Davis in Count Eleven is permissible, because it is not based on his mere association with the Pagans, or even his possession of a firearm while associating with the Pagans; it is based on allegations of his knowingly being "employed for" members of the Pagans, whom he knew to be prohibited persons; knowingly possessing a weapon on behalf of those members; and knowingly doing so in the course of his employment for the Pagans. Davis's as-applied challenge therefore fails.

 His theory fares no better as an overbreath attack. "A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell*, 449 F.3d at 498; *see also Virginia v. Hicks*, 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (discussing standard for a First Amendment overbreadth attack on a statute); *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (same); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 139 (2000) (noting that overbreadth doctrine can be applied based on infringements of "political speech *and* association rights protected by the First Amendment" (emphasis added)). Because overbreadth and vagueness are different doctrines, a finding that a statute is not unconstitutionally vague does not mean that it is not overbroad. "A clear and precise enactment may ... be overbroad if in its reach it prohibits constitutionally protected conduct." *Farrell*, 449 F.3d at 498–99 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)); *see also Holder*, 130 S.Ct. at 2719 (noting that "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process

Clause ... for lack of notice," but that "such a plaintiff may have a valid overbreadth claim under the First Amendment"). "All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court." *Farrell*, 449 F.3d at 498.

 To mount a successful overbreadth attack, the challenger must demonstrate that the relevant law "punishes a substantial amount of protected free speech [or association], judged in relation to [its] plainly legitimate sweep." *Farhane*, 634 F.3d at 136; *see also Hicks*, 539 U.S. at 119–20, 123 S.Ct. 2191 (noting that to strike down a law as overbroad, a court must determine that the "law's application to protected speech is 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications"). A court thus considers "not only conduct clearly prohibited by the regulation but also conduct that arguably falls within its ambiguous sweep." *Farrell*, 449 F.3d at 499; *see also Farhane*, 634 F.3d at 136 (same). A finding that a statute is overbroad "suffices to invalidate all enforcement of that law," unless the statute is subject to a limiting construction. *Hicks*, 539 U.S. at 119, 123 S.Ct. 2191. "Mindful that such relief is 'strong medicine,' the law rigorously enforces the burden on the challenging party to demonstrate *'substantial'* infringement of speech." *Farhane*, 634 F.3d at 136–37 (emphasis in original) (quoting *Williams*, 553 U.S. at 292, 128 S.Ct. 1830).

Defendant Davis does not even attempt to make this showing, nor does the Court see how he could. As discussed, the Bodyguard Statute does not reach individuals who possess firearms and merely associate with prohibited persons. It is therefore unclear how § 922(h) could apply to *any*,

let alone *a substantial amount of,* protected, purely associational activity. *See Holder,* 130 S.Ct. at 2730 (finding no First Amendment association injury where a criminal statute, by its terms, required more than mere association). The Second Circuit reached a similar conclusion in *United States v. Farhane,* 634 F.3d 127. There, an individual challenged his conviction under the same statute that was at issue in *Holder,* arguing that the statute was overbroad. In rejecting defendant's claim, the Second Circuit explained that the statute "leaves persons free to say anything they wish on any topic, including terrorism. It does not prohibit *independent advocacy* of any kind. It does not prohibit or punish mere membership in or association with terrorist organizations.... Such circumstances do not evidence overbreadth." *Id.* at 137 (emphasis in original) (citing *Holder,* 130 S.Ct. at 2730–33). By analogy, the Bodyguard Statute leaves persons free to associate with prohibited persons, to join organizations with those persons, to speak on their behalf, otherwise legally to possess firearms, and even to possess firearms while merely associating with prohibited persons. It is thus easily distinguishable from laws that impermissibly penalize association, such as criminal prohibitions on joining certain political parties, *see Elfbrandt v. Russell,* 384 U.S. 11, 18–19, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966) (striking down a state law establishing a loyalty oath and imposing perjury penalties on any affiant who was a member of the Community Party); *Robel,* 389 U.S. at 262, 88 S.Ct. 419 (striking down a provision of the Subversive Activities Act which prohibited members of specific Communist organizations from engaging "in any employ-

ment in any defense facility"); *De Jonge,* 299 U.S. at 356–57, 362, 57 S.Ct. 255 (striking down state syndicalism law which penalized membership in organizations that advocate "crime, physical violence, sabotage, or any unlawful acts or methods as a means of accomplishing ... political change"), and it is not overbroad.[11]

### D. Second Amendment Challenge

Davis also has incorporated an argument that the Bodyguard Statute violates his Second Amendment right to possess and carry a firearm for self-protection. (*Weaver* Mem. 15–16.) His adopted theory is that "[t]he Second Amendment right to possess and carry firearms for self-protection is burdened if virtuous citizens cannot carry or use their legal firearms without fear that a prohibited person may have an ulterior use for the otherwise constitutionally-protected act." (*Id.* at 16.) Davis raises two hypothetical applications of the Bodyguard Statute to illustrate his constitutional claim: (1) against a defendant, because a convicted felon, who, knowing defendant always carries a firearm, invites defendant to attend a meeting where, unbeknownst to the defendant, the felon fears trouble; and (2) against a defendant, where a convicted felon asks defendant, the felon's neighbor, to shoot a rabid fox, because defendant legally carries a gun and the felon cannot. (*Id.* at 16.)

▪ Again, the Court's first task is to determine the posture—as applied or facial—of Davis's Second Amendment challenge to the Bodyguard Statute. As a general matter, a court starts by asking whether a challenged law is unconstitution-

---

**11.** The Court notes again that, for present purposes, it is taking the allegations in the Superceding Indictment to be true. Defendant Davis may renew his First Amendment freedom of association claim if, at trial, the Government's case is based on his mere association with the Pagans.

al as applied to the circumstances of the case, based on the " 'principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court,' " *United States v. Decastro,* 682 F.3d 160, 163 (2d Cir.2012) (quoting *Parker v. Levy,* 417 U.S. 733, 759, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974)). Moreover, the Second Circuit has applied this rule in the Second Amendment context. *See id.* at 169 (holding that "[t]here is no overbreadth argument that [plaintiff, whose as-applied Second Amendment challenge had been rejected,] can make in the Second Amendment context"); *see also Kachalsky v. County of Westchester,* 701 F.3d 81, 101 (2d Cir.2012) (refusing to consider Second Amendment overbreadth challenge, noting that "[o]verbreadth challenges are generally limited to the First Amendment context," and explaining that even if "overbreadth analysis may apply to Second Amendment cases," it may be invoked only by plaintiffs who have asserted a meritorious as-applied Second Amendment challenge (citing *Broadrick,* 413 U.S. at 610, 93 S.Ct. 2908)).

The as-applied analysis proceeds in two parts. First, the Court must examine whether the application of § 922(h) to Davis substantially burdens his Second Amendment rights. If it does, then Count Eleven must be subjected to heightened scrutiny. *See Kachalsky,* 701 F.3d at 93 ("We have held that heightened scrutiny is triggered only by those restrictions that[,] like the complete prohibition on handguns struck down in *Heller[,]* operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense[,] or for other lawful purposes[ ]." (internal quotation

marks omitted)); *Decastro,* 682 F.3d at 165–69 (explaining that courts should apply heightened scrutiny in the Second Amendment context only to laws that impose a substantial burden).[12] If, by contrast, the Bodyguard Statute imposes only a "marginal, incremental or even appreciable restraint on [Davis's] right to keep and bear arms," then the Court need not subject it to heightened scrutiny. *Decastro,* 682 F.3d at 166; *see also United States v. Laurent,* 861 F.Supp.2d 71, 97 (E.D.N.Y.2011) (collecting cases for the proposition that courts initially ask "whether the prohibited act imposes a substantial burden on the right to bear arms for the purpose of self-defense in the home," because "[o]nly those acts that impose such a burden merit heightened scrutiny").

 The Second Circuit recently has explained that when a court evaluates whether a law imposes a substantial burden, the key inquiry should be whether, under the law, "adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Decastro,* 682 F.3d at 168 (holding that 18 U.S.C. § 922(a)(3), which prohibits the transportation of firearms from outside the state into one's state of residence, does not substantially burden the right to keep and bear arms, because it does not restrict purchasing a firearm in the home state). The key inquiry here is thus whether the application of § 922(h) to Davis leaves him with "adequate alternatives" otherwise to possess and use firearms for lawful purposes.

 The Supreme Court has been careful to note that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatso-

---

**12.** The Court discusses the appropriate level of heightened scrutiny below.

ever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Otherwise stated, the Supreme Court has stated that the Second Amendment right to keep and bear arms does not "protect the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595, 128 S.Ct. 2783 (emphasis in original). Indeed, the Second Circuit has characterized *Heller* as holding that "time, place and manner restrictions may not significantly impair the right to possess a firearm for self-defense, and may impose no appreciable burden on Second Amendment rights." *Decastro*, 682 F.3d at 165. "The clearest, and most frequent, examples" of laws which substantially burden Second Amendment rights are laws that "ban all gun possession by certain categories of individuals ... irrespective of the location of or purpose for such possession." *Kachalsky v. Cacace*, 817 F.Supp.2d 235, 264 (S.D.N.Y.2011) (collecting cases), *aff'd*, 701 F.3d 81. According to the Supreme Court in *Heller*, the Second Amendment serves three purposes: protecting militias, hunting, and self-defense. 554 U.S. at 599, 128 S.Ct. 2783 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right [of individuals to keep and bear arms]; most undoubtedly thought it even more important for self-defense and hunting."); *see also United States v. Masciandaro*, 638 F.3d 458, 468 (4th Cir.2011) (describing Heller as noting "the general preexisting right to keep and bear arms for participation in militias, for self-defense, and for hunting"). But *Heller* also noted that self-defense is "the *central component* of the right." 554 U.S. at 599, 128 S.Ct. 2783 (emphasis in original); *see also McDonald v. City of Chicago*, 561 U.S.

742, 130 S.Ct. 3020, 3044, 177 L.Ed.2d 894 (2010) (discussing the "personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home").

■ The application of Section 922(h) to Davis does not impose a substantial burden on his ability lawfully to possess or to use a firearm for these purposes. Congress, in enacting § 922(h) criminalized only knowingly possessing a firearm in the course of employment for known prohibited persons on a specific date. As applied here, the Bodyguard Statute does not restrict the time, manner, or place of Davis's lawful gun possession or use, nor even does the application of the statute criminalize his ability legally to possess a gun while merely associating with prohibited persons. Moreover, as the Court has already noted, the Government must prove that Davis knew that he was possessing a firearm, knowingly in the course of employment, for a known prohibited person. In other words, if the allegations in the Superceding Indictment are true, then it is axiomatic that Davis did not possess the firearm at Lahey's residence in furtherance of *his own* self-defense. And while there may be a very narrow set of hypothetical circumstances in which a Bodyguard Statute defendant might need his or her firearm for a valid self-defense purpose—for example, if an individual who is guarding a drug deal at the behest of his superior, a convicted felon, is suddenly attacked by a bear [13]—such remote possibilities are not appropriate considerations in reviewing Davis's as-applied challenge, and at most demonstrate that § 922(h) might impose a marginal restraint on the right lawfully to keep and to use arms, not a

---

**13.** U.S. News, *Fatal Black Bear Attacks Rare But Rising*, (May 29, 2011), *available at* http://health.usnews.com/health-news/diet-fitness/ fitness/articles/2011/05/29/fatal-black-bear-attacks-rare-but-rising.

substantial restraint, as required by *Decastro*. The application of the Bodyguard Statute to Davis thus triggers rational basis scrutiny. *See Kachalsky*, 701 F.3d at 93 (explaining that "heightened scrutiny is triggered only by those restrictions that . . . operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm" (internal quotation marks omitted)); *Decastro*, 682 F.3d at 165–69 (explaining that Second Amendment heightened scrutiny is necessary only for laws that impose a substantial burden on lawful gun possession).

■ At the second step of the as-applied analysis, the Court must determine whether the application of § 922(h) to Davis survives the relevant level of scrutiny. This is not a difficult question. Indeed, in an abundance of caution, the Court will assume that the application of § 922(h) to Davis substantially burdened his Second Amendment rights, triggering heightened scrutiny. That application nonetheless survives intermediate scrutiny—the appropriate level of heightened scrutiny under Second Circuit law.

■ The Supreme Court in *Heller* did not identify the level of scrutiny that courts should apply to laws that substantially burden Second Amendment rights. *See Heller*, 554 U.S. at 628–29, 128 S.Ct. 2783 (holding that challenged statute would fail under "any of the standards of scrutiny that we have applied to enumerated constitutional rights"); *Decastro*, 682 F.3d at 164. Nor has the Second Circuit adopted a categorical level of scrutiny by which to review laws that impose substantial burdens on firearms rights. *See id.* Instead, the Second Circuit has instructed that "heightened scrutiny" need not "always be akin to strict scrutiny," and that intermediate scrutiny is appropriate for gun laws that do not "burden the 'core' protection of self-defense in the home."

*Kachalsky*, 701 F.3d at 93. Thus, for example, in *Kachalsky*, the Second Circuit applied intermediate scrutiny to a New York state law that restricted an individual's ability to carry handguns "in public," as opposed to "in the home." *See id.* at 94–96.

■ With these principles in mind, the Court concludes that if were it to find that the application of the Bodyguard Statute to Davis imposed a substantial burden on his lawful gun ownership, intermediate scrutiny would be appropriate. To be sure, Defendant Davis is alleged to have possessed a gun at a private event, to protect a private home. He thus was not "in public" in the traditional sense. *See id.* at 94–95 & n. 20 (documenting traditional state regulations of firearms "on certain occasions and in certain locations" such as fairs and markets). But be that as it may, the fact remains that, according to the allegations in the Superceding Indictment, Davis was not carrying or "us[ing] arms in defense of" *his own* "hearth and home." *Heller*, 554 U.S. at 634–35, 128 S.Ct. 2783. To the contrary, he allegedly possessed a weapon as a bodyguard to protect someone else's residence from outside intrusion. This distinction is significant. The Second Circuit has acknowledged that, in holding that the home was situationally unique for Second Amendment purposes, it was drawing on prior Supreme Court decisions which establish the importance of the home in other constitutional contexts. *See Kachalsky*, 701 F.3d at 94 & n. 18 (discussing the importance of the "home" in First, Third, and Fourth Amendment jurisprudence). But the Supreme Court has also made clear in these other contexts that, with limited exceptions, the home is a unique repository of rights only for its owner or holder. *See, e.g., Minnesota v. Carter*, 525 U.S. 83, 90–91, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (explaining that

while "an overnight guest in a home may claim the protection of the Fourth Amendment, ... one who is merely present with the consent of the householder may not" and holding that Fourth Amendment protections were unavailable to individuals who, among other things, "were essentially present for a business transaction and were only in the home for a matter of hours"); *Stanley v. Georgia*, 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("If the First Amendment means anything, it means that the State has no business telling a man, sitting alone *in his own house*, what books he may read or what films he may watch." (emphasis added)). Finally, the emerging consensus appears to be that intermediate scrutiny is generally the appropriate level of scrutiny for laws which substantially burden Second Amendment rights. *See Kwong v. Bloomberg*, 876 F.Supp.2d. 246, 259 (S.D.N.Y. 2012) (collecting authority for the proposition that "the vast majority of courts have applied intermediate scrutiny to the Second Amendment challenges they have confronted"); *Laurent*, 861 F.Supp.2d at 103 ("Courts of appeals have adopted intermediate scrutiny to evaluate restrictions on gun possession by particular people or in particular places, analogizing these regulations to time, place, and manner restrictions on speech."); *Osterweil v. Bartlett*, 819 F.Supp.2d 72, 84 (N.D.N.Y.2011) (applying intermediate scrutiny); *Kachalsky*, 817 F.Supp.2d at 268 (same); *United States v. Oppedisano*, No. 09–CR–0305, 2010 WL 4961663, at *2 (E.D.N.Y. Nov. 30, 2010) (same); *accord Masciandaro*, 638 F.3d at 469–70 (same); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir.2010) (same); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir.2010) (same).

▬▬▬ "Courts applying intermediate scrutiny in the Second Amendment context have concluded that the asserted governmental objective must be substantial or important and that there must be a reasonable, but not perfect, fit between the challenged regulation and the asserted objective." *Kwong*, 876 F.Supp.2d at 259; *accord United States v. Chester*, 628 F.3d 673, 683 (4th Cir.2010); *Reese*, 627 F.3d at 802; *Marzzarella*, 614 F.3d at 98. The Second Circuit has articulated this test in contexts outside the Second Amendment in much the same way: "Under intermediate scrutiny, the government must show that the challenged legislative enactment is substantially related to an important governmental interest." *Ramos v. Town of Vernon*, 353 F.3d 171, 175 (2d Cir.2003); *see also Laurent*, 861 F.Supp.2d at 98 ("Intermediate scrutiny has been formulated in a number of ways, all requiring some form of serious government interest and a substantial connection between furthering that interest and the limit on the constitutional right.").

It is clear that an important government interest is at stake here. Congress enacted 18 § 922(g)(1) to " 'prohibit [ ] categories of presumptively dangerous persons' from possessing firearms." *Burrell v. United States*, 384 F.3d 22, 27 (2d Cir. 2004) (quoting *Lewis v. United States*, 445 U.S. 55, 64, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980) (alteration in original)); *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983) ("Congress obviously determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them."), *superceded, in part, by statute*, Firearms Owners' Protection Act, Pub. L. No. 99–308, 100 Stat. 449 (1986), *as recognized in Logan v. United States*, 552 U.S. 23, 27–28, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007). Moreover, challenges to § 922(g)(1) have been uniformly rejected by each of the Circuit Courts of Appeal to have considered the issue. *See United States v. Bo-*

*gle,* 717 F.3d 281, 282 & n. 1 (2d Cir.2013) (per curiam) (upholding § 922(g)(1) against Second Amendment challenge); *United States v. Moore,* 666 F.3d 313, 316–17 (4th Cir.2012) (collecting authority from the First through the Eleventh Circuits); *Schrader v. Holder,* 704 F.3d 980, 989 (D.C.Cir.2013). Indeed, the Supreme Court specifically acknowledged the constitutionality of § 922(g)(1) in *Heller,* by stating that *Heller's* holding should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626–27, 128 S.Ct. 2783; *see also McDonald,* 130 S.Ct. at 3047 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill . . . ." (internal quotation marks omitted)).

Congress enacted § 922(h) "to prevent the individuals listed in [§ 922(g) ] from circumventing the firearm prohibition by employing armed bodyguards." *Weaver,* 659 F.3d at 357. The Bodyguard Statute thus "close[s] a loophole that allowed prohibited persons, in this case convicted felons, to possess firearms by proxy." *Weaver,* 2012 WL 727488, at *2. And because § 922(h) reinforces § 922(g), it serves the same objective already found adequate by courts to justify the regulation of firearms. *See Weaver,* 2012 WL 727488, at *6 ("The governmental interest to which § 922(h) is directed, then, is similar to that to which any subsection (g) offense is directed—both subsections aim to diminish gun violence by removing firearms from the possession and control of those 'persons classified as potentially irresponsible and dangerous.' " (quoting *Barrett v. United States,* 423 U.S. 212, 218, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976))).

The remaining question is whether § 922(h) is reasonably related to this objective. The only other court to consider the issue found that it is, noting that "even an individual who maintains an employment relationship with a prohibited person may lawfully possess firearms, provided he [or she] is not acting in the course of employment *at the time of the firearm possession,*" and that "Congress tailored the prohibition in § 922(h) to cover only certain individuals at certain times and when they act in certain ways." *Id.* at *8 (emphasis in original). In particular, the court explained that § 922(h) was a "commonsense extension" of § 922(g), and that it "merely closes a loophole in § 922(g)(1), a plainly constitutional statute." *Id.* This Court similarly finds that, given the limitations it has detailed above, namely that the defendant must know both that his employer is a convicted felon and that defendant is possessing a firearm in the course of his employment for a convicted felon, § 922(h) is reasonably related to the important governmental objective of "reducing gun violence by fully disarming felons." *Id.*

Davis's Second Amendment argument fails as a facial or overbreadth challenge as well. First, Davis lacks standing even to assert such a challenge, given that this application of the Bodyguard Statute to him is constitutional. *See Kachalsky,* 701 F.3d at 101 ("In view of our determination that New York's proper cause requirement is constitutional under the Second Amendment as applied to [p]laintiffs, we also reject their facial overbreadth challenge."); *Decastro,* 682 F.3d at 163, 169 ("There is no overbreadth argument that Decastro can make in the Second Amendment context."). Second, Davis has not demonstrated "that 'no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.' " *Decastro,* 682 F.3d at 168 (quoting *Wash. State*

*Grange v. Wash. State Republican Party,* 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)). *See generally Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (articulating the "no set of circumstances" test); *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (same). The Bodyguard Statute legitimately seeks to close a loophole left open by § 922(g), and is part of a comprehensive scheme enacted to keep firearms out of the control of dangerous criminals.

Of course, nothing in this Opinion should be read to "rule out the possibility that, on a different set of facts, a defendant might be able to establish that the application of [§ 922(h)] to him [or her] would burden his [or her] right to keep and bear arms so substantially as to render the statute unconstitutional as applied." *Decastro,* 682 F.3d at 169 n. 7. The Court also reiterates that if the Government's proof at trial raises additional or unanticipated Second Amendment concerns, Davis may renew his Second Amendment argument on a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29. In the interim, however, Davis's Motion is denied.

### III. Conclusion

For the reasons stated herein, the Moving Defendants' Motions are DENIED. The Clerk of Court is respectfully directed to terminate Defendant Davis's pending Motion, (Dkt. No 73).[14]

SO ORDERED.

---

14. The balance of Defendant Tarrats's Motion, (Dkt. No. 69), is addressed in a separate